Filed 2/6/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITY OF MODESTO et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>THE DOW CHEMICAL COMPANY et al.,<br><br>     Defendants and Respondents. | A134419<br><br>(San Francisco County Super. Ct. Nos. CGC-98-999345 & CGC-98-999643)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on January 8, 2018, be modified as follows:

1.  On page nine, the first full paragraph is divided into two paragraphs and modified to read:

    The residents of Modesto rely on groundwater wells to produce most of their potable water. The City is served by a network of 90 wells designed to serve specific neighborhoods, and operating interdependently. If a well is taken off-line, nearby wells are required to pump at greater capacity and the contamination plume is likely to migrate to those wells.

    PCE has been detected in four of the City's wells, and two were removed from service after exceeding the state-mandated MCL. The parties dispute whether and when the third and fourth wells (or additional wells) will exceed the MCL for PCE.

2.  On page 20, the first sentence of the first paragraph under section IV.A., subheading "*1. The Precise Issue on Appeal,*" is modified to read:

1

The judge in Phase IV concluded, based on his reading of *Modesto I*, that liability under the Polanco Act could be established *only* by proof of each link in a very specific chain of causation.

3. On page 32, the final two sentences of footnote 10 are modified to read:

The language on its face requires no such direct linkage, but only proof that defendants' disposal instructions resulted in obstructing free use of property and that defendants' conduct was a substantial factor in creating that harm. We also note, in passing, that it does not appear any such heightened degree of proof was used when the jury applied this instruction in Phase I.

4. On page 33, at the end of the first full paragraph, add as footnote 11, the following footnote, which will require renumbering of all subsequent footnotes:

[11] In their petition for rehearing, defendants disclaim that they ever "insisted . . . that causation could be proven only by direct evidence." But defendants did insist—and argued that the trial court insisted—on proof that dry cleaners read, relied upon and followed defendants' instructions. "As Judge Goldsmith made clear, the evidence must show that *the reason* the drycleaner [disposed of the PCE waste consistent with defendants' instructions] was that she or he *read and acted on* [] the instruction[s]." (Italics added.) Defendants do not explain how those facts could be proven other than by direct evidence.

5. On page 37, the third sentence of the second full paragraph is modified to read:

Defendants contend, more precisely, it was not proven that during the years their product was provably sold at any Phase IV site, an improper disposal instruction was disseminated.

6. On pages 40-41, the first and second paragraphs following section IV.A., under the subheading "*7. Conclusion*" are integrated and modified as follows:

Defendants argued and the trial court concluded that *Modesto I* set up a special proof standard under the Polanco Act, viz, that causation can be demonstrated *only* by proof that a specific disposal instruction was received by a dry cleaner who read, relied on and followed the instruction and by that act caused the contamination, to the exclusion of any other evidence that might be relevant to prove defendants assisted in creating the pollution. This is not a fair reading of the opinion. *Modesto I* did not set limits on

2

how *causation* was to be proven; it articulated a liability standard that required, as a threshold matter, that the provider of the product be something more than a mute, passive supplier. "Those [manufacturers] who took affirmative steps directed toward the improper discharge of solvent wastes—for instance, . . . by instructing users of its products to dispose of wastes improperly—may be liable under [that statute]" but those who *merely* placed solvents in the stream of commerce without warning about the dangers of improper disposal are not liable. (*Modesto I*, *supra*, 119 Cal.App.4th at p. 43.) That formulation does not change the causation analysis, which is, considering the evidence as a whole, is it more likely than not that defendants' improper instructions, and any other relevant conduct, were a substantial factor in causing the pollution. Because the trial court imposed a far more stringent proof of causation requirement in the Phase IV trial, we shall vacate that portion of the judgment.

7. On page 95, after the fourth paragraph in section "V. DISPOSITION" the following paragraph is added:

The further proceedings ordered herein shall not include R.R. Street and Company.

There is no change in the judgment.

Defendants' petition for rehearing is denied.

(Ruvolo, P.J., Streeter, J., and Rivera, J.[*] participated in the decision.)

Dated: _____                                    _____, P.J.

_____

[*] Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

3

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITY OF MODESTO et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>THE DOW CHEMICAL COMPANY et al.,<br><br>        Defendants and Respondents. | A134419<br><br>(San Francisco County Super. Ct. Nos. CGC-98-999345 & CGC-98-999643) |

## I.  INTRODUCTION

In late 1998, the City of Modesto (the City), the City of Modesto Sewer District No. 1 (the Sewer District) and the Modesto Redevelopment Agency (the RDA) sued various retail dry cleaning businesses (dry cleaners) operating in Modesto together with the manufacturers of dry cleaning equipment used at those dry cleaners, and the manufacturers and distributors of dry cleaning solvent.  Plaintiffs alleged that defendants had caused the City's groundwater, sewer system and easements, and the soil of property located within the project area of the RDA, to become contaminated with perchloroethylene (PCE), a "toxic chlorinated solvent[]."  Plaintiffs sought recovery for the past, present and future costs of investigation and remediation of the contamination at numerous sites under multiple legal theories.

This action has engendered nearly 14 years of litigation, including three detours to this court, and five trial phases.  A final judgment was entered in November of 2011, and an amended judgment in May 2012.  To the extent it can be summarized in one sentence,

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, Sections I, II, III.B. and Section IV.A. (except subsection *1.*) of this opinion are certified for publication.

the judgment awarded plaintiffs damages with respect to three dry cleaning sites, including an award of punitive damages against three defendants; as to all other claims, judgment was entered in favor of defendants.

An issue that has been central to this litigation from the outset is the interpretation and application of the Polanco Redevelopment Act (Health & Saf. Code, § 33459 et seq.) (the Polanco Act),[1] which, in essence, authorized redevelopment agencies to remediate contamination found in property, including private property, located in a redevelopment project area, and to recover from the "responsible parties" the costs of the cleanup.  Early in the case, this division issued a decision, on a petition for writ of mandate, providing our construction of that law.  Specifically, we reversed the trial court's summary adjudication of the Polanco Act claims, concluding that the trial court erred in finding, as a matter of law, that defendants could not be "responsible parties" under the Act based on the facts put forward by the plaintiffs.  (*City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 [*Modesto I*].)

Thereafter, the Polanco Act claims were tried two times, with respect to different contaminated sites, before two different judges, with different results.  In the second proceeding, the trial court concluded that *Modesto I* implied a special causation standard was applicable to the Polanco Act claims.  In the published portion of this opinion we hold that no special causation standard applies and we will, accordingly, vacate the trial court's ruling and order on the Phase IV Polanco Act claims.

In the unpublished portion of the opinion we address the remaining issues on appeal.  We will vacate the trial court's pretrial ruling with respect to plaintiffs' nuisance claims; the punitive damages award against defendant, the Dow Chemical Company (Dow) in Phase I; and the trial court's directed verdict on grounds of no present injury as to various sites in Phase III.  Our determinations with respect to the statute of limitations, the denial of equitable relief, the amended judgment, the prevailing parties and the allocation of settlement credits will be described in the course of the opinion.

---

[1]  All unattributed statutory cites are to the Health and Safety Code.

## II. GENERAL BACKGROUND

We begin by providing some general technical information about the characteristics of PCE, how it can contaminate groundwater, how it is used and reused in dry cleaning equipment, and how it was released into the environment. This is not a comprehensive discussion of the evidence but is intended only to supply context for our discussion of the issues on this appeal.

### A. Characteristics of Perchloroethylene

Perchloroethylene, also known as tetrachloroethylene, is a molecule containing chlorine atoms and carbon atoms. It is also characterized as a "volatile halogenated organic compound," a "halogenated hydrocarbon", a "chlorinated solvent" or a "chlorinated hydrocarbon". As shorthand, it is referred to as "perc" or PCE. All chlorinated hydrocarbons, like all solvents other than water, are "toxic." In 1978, the National Institute for Occupational Safety Hazards (NIOSH) recommended that PCE be handled as if it were a human carcinogen. In 1980 the State of California began regulating PCE as a hazardous waste. In 1984, when the Resource Conservation Recovery Administration (RCRA) was reauthorized, its regulations brought "small dry cleaners" under the same requirements as major hazardous waste sources, with respect to PCE.

The California Department of Health Services has set the maximum contamination level (MCL) for PCE in drinking water at 5 parts per billion based on its finding that PCE potentially causes cancer in humans. Applying this standard, if one cup of PCE were completely dissolved in water, it could contaminate 24 million gallons of groundwater. There are also regulations to prevent migration of PCE vapors in concentrations that could cause cancer. All parties agree that the applicable regulatory standards are not arbitrary and address genuine public health risks.

PCE is a colorless liquid, and is therefore difficult to see once released into soil. It is a cleaning solvent used by dry cleaners and also in degreasing operations. Because in its pure form it is a dense non-aqueous phase liquid (DNAPL), it is heavier than water and so when placed in water it will sink and sit below the water. This is distinguished

3

from a light non-aqueous phase liquid (LNAPL), such as gasoline, that is lighter than water and will therefore float on top. PCE also has lower viscosity (internal friction) than water and so it is very mobile and can move quickly to penetrate, for example, small cracks or joints in concrete. PCE does not readily dissolve in water—thus, "non-aqueous"—although it will dissolve very slowly over time. PCE is also quite volatile, meaning it will quickly become a gas when it is heated or released into soil where it mixes with the soil gas.

As is explained below, PCE is particularly "persistent" and "long lived" compared to other contaminants, making it extremely difficult to accomplish complete remediation.

### B. The Flow and Transport of PCE in a Groundwater System

The City of Modesto uses groundwater as a primary source of its drinking water supply. The hydrologic cycle for groundwater is fairly straightforward. The rain falls and sinks into the "soil zone" which is the layer near the surface where plants and trees take it up with their roots. The rest of the water continues to move downward through the soil into the "vadose zone," in which there are various types of soils—fine grain such as clay or silt and coarse grain such as sand or gravel. Some of the water may "perch" on the fine grain materials but other water will flow through the coarser soil media and recharge the water table, which is at the top of the "saturated zone" from which ground water is pumped by wells. Between the vadose and saturated zones is a "capillary fringe." This space can hold "quite a bit of liquid," and the porous media can pull water up from the water table.

As we have noted, when PCE is released into the ground it can volatilize and mix with the soil gases. Where there is a very high concentration of PCE in the soil the PCE gas, which is denser than air, will tend to sink. If it reaches all the way to the capillary fringe it can then recondense on the water table and begin to dissolve into the groundwater.

When released into the ground, PCE can also remain in liquid form and will sink through the subsurface to the water table. Unlike gasoline—which is a LNAPL and will tend to float on top of the water table—PCE is a DNAPL and so will continue to move

4

past the water table and through the saturated zone. Because it dissolves into water only very slowly, it creates a long-term continuing source of contamination to any groundwater that comes in contact with it.

Small releases of pure PCE will tend to penetrate only into the vadose zone because it gets "pulled apart" as both a gas and a liquid and will eventually get trapped in the soil pores—much like a small amount of coffee will be absorbed into and trapped in a sugar cube. When more PCE is added, however—either a larger release or repeated releases—the PCE breaks out and penetrates deeper. Even if it pools or perches on the fine-grained soil layers, it can still stair-step down through the subsurface and reach the capillary fringe and—if there is enough PCE—the water table. If PCE is being cleaned out of the groundwater, the PCE that pools or has been trapped above the water table will continue to move into the water table—a process called "back diffusion"—and thus is another long term source of groundwater contamination. PCE that has been trapped in the subsurface can also move downward during a "recharge event;" the PCE can dissolve into the rainwater and be released from the vadose zone, and is yet another long-term source of contamination.

PCE that pools on top of fine-grained layers will stop moving vertically but then will begin to move in other directions due to differing soil strata and "fine textural changes" in the sand; as a result, PCE will have a very complicated pattern of distribution, making it more difficult to locate. Also, because DNAPL's can be trapped in various ways, and then dissolve and move over time, they are extremely difficult to clean up. There are sites in the United States where they have been trying to clean up PCE for decades.

**C. The Use, Reuse and Release of PCE and PCE Residue at Dry Cleaners**

As we have described, PCE is particularly "persistent" and "long lived" compared to other compounds, making it difficult to remediate but advantageous for industrial use because it can be reused after being distilled back to its pure state. Dry cleaning equipment therefore has the capacity to do that. Here we provide an elementary description of how the various machines work.

5

From the 1950's to the 1970's, dry cleaners used what is now referred to as "first generation" equipment.  In that iteration, the washer and the dryer were separate machines.  In this equipment PCE was continuously pumped into, and drained out of, the washer from a tank on the bottom of the machine into the basket containing the clothing.  As the solvent drained out it was sent through a filter, to clean out the solids, dyes and soil being removed from garments, before it was pumped back into the washing basket.  After the cleaning cycle was complete, the washer entered a spin cycle to remove and drain as much solvent as possible back into the tank.   The clothing was then moved to the "reclaiming dryer."  This dryer did not vent to the air during the drying cycle; the vapors were kept in the machine in order to recover the solvent.  The dryer also had a lint trap.  As will be explained, the vapor was then cooled using water coils to recondense the solvent back to liquid form.

The "second generation" machines were used from the 1970's to the mid-1980's.  This equipment operated in the same way, but combined the washing and drying functions into one "dry-to-dry" machine.  Also, after reclaiming most of the vapor, some residual vapors were vented into the air at end of the dry cycle.  An operator, however, could add a "sniffer" (carbon adsorber) to capture the vapors.  These were very large and contained perhaps 100 pounds of charcoal or carbon in which the vapors were caught.

The "third generation" machines were used from the mid-1980's to the mid-1990's.  These were also dry-to-dry machines, but used refrigeration coils instead of water to cool the vapor, which was far more efficient in turning vapors to liquid for recovery.  The fourth generation machines added a built-in carbon adsorber to filter out the last traces of PCE vapors before the door to the machine was opened.

Reclaiming dryers (or "reclaimers") operate with hot air, so the solvent on the clothing vaporizes.  Those vapors are continually blown out of the reclaimer by a fan, through the lint filter.  The vapors enter a pipe with cooling coils, where the solvent turns to liquid and drips off the coils into a pipe leading to the water separator.

The water separator is a device by which any water—even just from humidity in the air—is removed from the recaptured solvent.  All used solvent, no matter from where

6

it is reclaimed or distilled, must go through the water separator before it is reused. The water separator operates by gravity. Because PCE is heavier than water, it will settle to the bottom of the separator. It is then siphoned out by a drain that is piped back to the tank. The water, called "contact water" or "separator wastewater" is drained out through a different pipe located higher in the separator, and was (during the pertinent time period) sent either down a drain or into a pail, depending on how the machine had been set up. All contact water has a certain amount of PCE left in it, because the separation is "imperfect."

As noted, some dry cleaners added a sniffer, or carbon adsorber, to collect solvent vapors. To release the solvent from the sniffer, live steam would be applied to the charcoal bed to release the solvent as vapor; the steam and vapors were then vented to the pipe with the cooling coils where they would condense and go to the water separator. This process creates significantly more separator wastewater than other reclaiming processes because of the large amount of steam.

The final major piece of equipment is the still, which is used to clean the solvent. All solvent is periodically sent to the still, because it will accumulate residual oil, grease, wax, detergent and other impurities. The solvent is heated with steam coils until it begins to vaporize. The vapors are sent through pipes with cooling coils and then to the water separator. The residue, that is, what remains behind after the PCE is vaporized, is called "still bottom residue" or "muck."

A still is also used to extract PCE from the filters in the machines that capture the solids, dyes and soils. Historically, dry cleaners used diatomaceous earth (a powder) to filter the PCE, but later they began to use cartridges filled with carbon or carbon and activated clay; some had pleated cellulose on the outside. The still had mechanical paddles to continuously stir the mixture to release the PCE. The residue, or "muck" was then shoveled into a container, and disposed of as waste. This residue contained about 20 percent to 25 percent PCE. A similar process was used for the cartridges. When the cartridge needed to be changed it was removed and drained for 24 hours; that liquid went into the still and was processed leaving a residue like very heavy heating oil, which was

drained out through a valve into a pail.  In the first generation equipment the PCE content left in the residue could be as high as 50 percent.  In the new equipment (being sold in the early 2000's) there is as little as 10 percent.

Even after draining the filter for 24 hours there could be as much as a gallon and a half of PCE remaining in the filter.  At some point prior to 1984, a process was developed by which, like cleaning out a sniffer, high pressure steam was used to release the remaining PCE from the filter cartridge, although it could never remove 100 percent.  This was accomplished by a "solvent recovery system" or SRS.  The cartridges were placed into a tank and steam was released into the tank to vaporize the PCE which, again, goes to the water separator.  This involves a great deal of steam, and creates a "tremendous" amount of contact water—up to 20-25 gallons.

In very general terms, PCE releases into the environment occurred as a result of equipment failures or leaks during operation or maintenance of the machine or the water separator, leaks in joints or valves due to vibration of equipment, and leaks or spills during solvent delivery or transfers which are flushed to the outdoors, or which permeate the concrete floors, or seep through the cracks or joints in the floors.  PCE releases also occurred as a result of tossing filter cartridges into the garbage, tossing muck into the trash or into dumpsters, or "out the back door"; and by PCE disposal practices which have been described as "dumping" or "back lot burial."  PCE also entered the soil by releases of separator water on the ground or down the drain and into the sewer system, thence out of sewer pipes into the ground.

In addition, those servicing the dry cleaners on behalf of the manufacturers or distributors performed tests to check on the amount of detergent in the solvent.  The dry cleaners did not want that liquid to be put back in the machines because it used a strong dye, so as a practical matter the test liquid, which contained about 25 percent PCE, was poured down the drain.

### D.  Contamination of Soils, Groundwater and Wells in Modesto

Defendants do not dispute that the soils at many dry cleaning sites in Modesto are contaminated by PCE.  It is also not the subject of serious dispute that this contamination

8

has dispersed through the subsurface and into the groundwater at many sites. PCE contamination can enter a municipal supply well by migrating with the groundwater generally according to the natural gradient, but when it is near a well, it will come within the "cone of draw" and will be captured and pumped into the well.

The residents of Modesto rely on groundwater wells to produce most of their potable water. The City is served by a network of 90 wells designed to serve specific neighborhoods, and operating interdependently. PCE has been detected in four of the City's wells, and two were removed from service after exceeding the state-mandated MCL. If a well is taken off-line, nearby wells are required to pump at greater capacity and the contamination plume is likely to migrate to those wells. The parties dispute whether and when the third and fourth wells (or additional wells) will exceed the MCL for PCE.

This action was filed as a result of the PCE contamination from the dry cleaning sites in Modesto.

### III. PROCEDURAL HISTORY

#### A. Overview

The original complaint was filed in 1998 and final judgment was not entered until 2012. The record filed on appeal—which is not the complete record of the proceedings below—contains reporters' transcripts exceeding 15,000 pages, and 25,000 pages of court filings exhibits, and deposition transcripts. This case has followed a complex and tortuous path, each step of which need not, and will not, be chronicled. We provide here only a brief summary of the procedural events out of which the issues before us arose.

#### B. The Parties to the Appeal

The City of Modesto is a plaintiff and the principal appellant. The RDA also filed a separate action, which was consolidated with the City's action. In 2012, however, the legislature effectively dissolved all redevelopment agencies. (§ 34172.) The City became the RDA's "successor agency" by operation of law (§ 34173), and pursues the RDA's appeal, together with the City Attorney of Modesto who, representing the People of the State of California, seeks a nuisance injunction. The Modesto Sewer District No. 1

9

was also a plaintiff and a cross-defendant but is involved in this appeal only with respect to the cost award entered against it. For ease of reference we will refer to all plaintiffs as "the City."

The operative complaints named 28 defendants. Along the way, however, most of the defendants settled, and there now remain only five active participants. They are: two dry cleaning establishments, Modesto Steam Laundry (MSL) and Estate of Shantilal Jamnadas, dba Halford's Cleaners (Halford's); two PCE manufacturers, the Dow Chemical Company (Dow) and Axiall Corporation, the successor in interest to PPG Industries, Inc. (PPG); and one PCE distributor, R.R. Street & Company (Street), which also manufactured some equipment used by the dry cleaners. Dow is the sole cross-appellant on the issue of punitive damages.

### C. The Pleadings

The first complaints were filed in 1998, one by the RDA and the City Attorney (on behalf of the People), and the other by the City of Modesto and its Sewer District. Named in the action were dry cleaning establishments, distributors and manufacturers of PCE, and manufacturers of dry cleaning equipment. After three years of demurrers and amendments, the operative pleadings were settled upon. In essence, the RDA, the People, the City and the Sewer District were suing 28 defendants for their roles in polluting the soil, the groundwater and the sewer system in Modesto with chlorinated solvents. The causes of action alleged against defendants included: negligence, products liability, statutory liability, trespass and nuisance. The two actions were consolidated.

Various defendants cross-complained against the City and the Sewer district for contribution, indemnity and declaratory relief. Defendants did not prevail on any of the cross-complaints.

### D. The Summary Adjudication Motions

Shortly after the pleadings were settled, Dow, PPG and others filed a motion for summary adjudication on the nuisance and trespass claims. Four and a half months and 7,000 pages later, the motion was granted as to Dow and PPG. The trial court ruled that liability for nuisance required evidence that the defendants had control over the solvent

10

use and disposal activities of the dry cleaner or "direct involvement . . . in the design and installation of unsafe disposal systems or dry cleaning equipment;" it was not enough for plaintiffs to prove that the manufacturers were aware of the hazards of solvents and provided "insufficient or inaccurate instructions and warnings . . . concerning the[ir] use, handling and disposal…." The City filed a petition for writ of mandate in this court seeking interlocutory review of the ruling; the petition was summarily denied.

Dow, PPG and others then filed a motion for summary adjudication of the RDA's statutory claim under the Polanco Act. The Polanco Act provides, by reference to the Water Code, that those who "discharge[] waste" or "cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance" are liable for costs associated with cleaning up the pollution. (§ 33459, subd. (h); Wat. Code § 13304.) The trial court granted the motion as to Dow and PPG, again concluding that plaintiffs' evidence did not show that these defendants "either directly participated in or exercised authority or control over on-site activities or disposal activities at Modesto dry cleaners."

The City again filed a petition for writ of mandate seeking review of the trial court's order. We granted the petition, vacated the trial court's ruling and remanded the matter for a new hearing on the motion. (*Modesto I*, *supra*, 119 Cal.App.4th 28.) Our opinion will be discussed in detail below. For now, it is sufficient to say we concluded that the Polanco Act should be construed in keeping with principles of nuisance; that in keeping with those principles, liability is not limited to those who directly participate in or have control over discharges but also includes those who assist in creating the pollution; and that a defendant who provides instructions to users regarding the improper disposal of toxic chemicals can therefore be liable under the Act.

On remand, the court denied Dow and PPG's summary adjudication motion on the Polanco Act claim. Plaintiffs then requested the court to reconsider its ruling on the nuisance motion in light of *Modesto I*. The court ruled there was no basis for reconsideration because this court had previously denied the petition for a writ of

11

mandate on the nuisance summary adjudication ruling. Plaintiffs contend the denial of the reconsideration motion was error.

### E.  The Phase I Jury Trial

In an effort to manage this complex action, the parties agreed to try in the first two phases only those issues pertaining to the contamination of four City wells, identified by their numbers (3, 8, 21 and 225) and all of the City's claims against four dry cleaners, including MSL and Halford's. Three of those dry cleaners were alleged to be the source of contamination at Wells 3, 8 and 21. Two other dry cleaner defendants were included but only the well-related claims (Well 225) were to be tried in Phase One.

Prior to trial, defendants filed motion in limine number 40 (MIL 40) seeking to bar the testimony of plaintiffs' expert, Anthony Brown, relating to anticipated future remediation costs which plaintiffs sought to recover as damages. Defendants argued that these claims (1) were too speculative, (2) did not involve any damage to City property, and (3) were foreclosed by federal and state "superfund" statutes.[2] The trial court granted the motion on the first and third grounds. The City argued this ruling was erroneous.[3]

After a four-month trial, the trial court granted a nonsuit on all claims relating to Well 8 and granted a nonsuit to Dow and PPG as to the claims relating to Well 225. As pertinent to this appeal, the jury awarded plaintiffs damages of over $3 million against various defendants resulting from the contamination at three sites (Modesto Steam Laundry, Ideal and Coffee Plaza) and found against Street and a solvent manufacturer (Vulcan) on the City's public nuisance claim at Coffee Plaza. The jury also found against Dow, Street and Vulcan on the issue of malice, and, awarded punitive damages of $75,000 against Street, $75 million against Dow, and $100 million against Vulcan.

---

[2]  The federal statute is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.). The California superfund law is the Carpenter-Presley-Tanner Hazardous Substance Account Act (HSAA) (§ 25300 et seq.).

[3]  The City withdrew this issue as a ground for appeal in its reply brief, having noted that defendants did not dispute that their preemption argument would not apply to a public nuisance injunction, and did not contest the City's authorities to that effect.

12

Dow, Street and Vulcan filed motions for judgment notwithstanding the verdict (JNOV) with respect to malice, contending it was not supported by substantial evidence. Dow, Street and PPG also argued, in JNOV motions, there was insufficient proof of causation to support the verdict. These motions were denied. Dow and Vulcan also sought a new trial with respect to the amount of punitive damages. The trial court reduced the awards to $5,441,221 against Dow and $7,254,115 against Vulcan, ruling that this was the maximum allowed both under the federal constitution and in light of the evidence. The trial court conditioned the denial of a new trial on the City's acceptance of the reduced amounts.

Dow contends the jury's findings regarding malice were not supported by substantial evidence. The City argues the punitive damages should not have been reduced.

### F. The Phase II Court Trial

In the next phase, the parties introduced additional evidence related to the City's statutory claims, which were tried to the court. With respect to the Polanco Act claim relating to the MSL site, based on the entire evidentiary record of Phases I and II, the trial court found in favor of the RDA and against Dow, PPG, Street and MSL. It awarded $88,143 for regulatory oversight charges and $349,808 in "response costs." The court also ordered that the final judgment include an injunction requiring the defendants to comply with any future remediation orders from the state's Department of Toxic Substances Control (DTSC) or the Regional Water Quality Control Board (the Board) at the Modesto Steam Laundry site, "subject to the right to challenge such orders in this Court. . . ." On the HSAA (state "superfund" statute) claims against MSL and Halford's, the court found against the dry cleaners; it awarded the City its response costs and directed the entry of equitable relief in the final judgment.

### G. The Phase III Jury Trial

In Phase III, the City sought damages under negligence and strict liability theories for contamination of City property (groundwater and soil in street and sewer easements) at the remaining dry cleaner sites. Before the case went to the jury, however, the trial

13

court granted a directed verdict as to 14 sites. The court ruled that, as to those sites, the City had not proven its appropriative interest in groundwater had suffered a present injury, as opposed to a possible future injury, and that the City had not proven any damage to its sewers, streets or soil. The City contends this ruling was erroneous.

As pertinent to this appeal, the jury found Dow and PPG liable on at least one product liability claim at the group of sites referred to as "Elwood's" and awarded the City $320,000 in investigation costs and $18 million for future costs for remediation. Defendants, however, had raised a statute of limitations defense with respect to those sites. The jury found that the City's claimed harm at the Elwood's sites occurred before December 3, 1995 (three years prior to the filing of the complaint), but the jury could not agree on the factual question pertaining to the discovery rule.

The jury rejected plaintiffs' claim of malice against Dow.

Post-trial, the City moved for JNOV as to the finding that the harm at Elwood's had accrued before December 3, 1995. The City argued, in essence, that defendants had failed to provide the necessary expert testimony to support that finding. The trial court denied the motion, concluding the record as a whole was sufficient to support the finding. The City challenges this ruling on appeal.

Defendants, for their part, brought a motion for judgment on their statute of limitations claim, pursuant to the Code of Civil Procedure section 630, subdivision (f). After this court issued an alternative writ instructing the trial court to take action on the motion, the court granted the motion based upon the jury's finding that the harm at Elwood's had accrued outside of the three-year statute of limitations. The court also ruled that the City could not rely on the delayed discovery rule because it failed to prove that it did not discover the harm until after December 1995.

As a result of the pre- and post-trial rulings, the City recovered nothing in the Phase III jury trial.

### H. The Phase IV Court Trial

In the follow-on to Phase III, the parties submitted additional evidence pertaining to the Polanco Act claim with respect to five sites. As will be described in detail later in

14

this opinion, the court ruled in favor of defendants. The City contends the court erred in applying an improper causation standard for the Polanco Act claim.

### I. The Phase V Court Trial

Finally, the trial court held an evidentiary hearing to determine whether, considering events transpiring since the Phase II decision, the equitable relief ordered in Phase II with respect to the MSL and Halford's sites was still warranted. The trial court found that, due to the EPA taking responsibility for clean-up at Halford's, the clean-up work already accomplished at MSL, the filtration treatment being conducted at Well 3, and the availability of settlement funds, no equitable relief was warranted. The City also challenges this ruling.

### J. The Remaining Rulings and Entry of Judgment

In preparation for entry of judgment, the trial court issued orders on a number of outstanding issues. As pertinent here, the court allocated settlement credits and concluded that Dow, PPG and Street were entitled to full credit for their liability against the approximately $37 million in settlements, excluding the punitive damages award. The trial court also decided, as to each set of trial phases, who was the prevailing party and entered judgment.

Defendants moved to set aside the judgment, arguing that they were prevailing parties in Phase II, as a matter of law, because in Phase V the court denied any equitable relief with respect to the Phase II liability determination. The trial court agreed and entered an amended judgment.

After extensive post-judgment activity, the trial court entered an order against the City for payment of a portion of defendants' costs.

The City contends that the trial court did not have jurisdiction to enter an amended judgment and that the rulings on the settlement credits and (in the amended judgment) on the prevailing party in Phase II were erroneous.

### K. On Appeal

On appeal, the City proposes a wholly new argument and remedy. It asks us, in the event we reverse the summary adjudication in favor of Dow and PPG on the nuisance

15

causes of action, to direct the trial court to issue an injunction that would: "(1) compel Dow and PPG to comply with any and all PCE remediation or investigation orders issued by appropriate officials of the City of Modesto . . . ; [¶] (2) limit Dow and PPG's obligations under such orders to remediation or investigation steps not already in progress, and that are not subject to any applicable settlement funds Modesto received in this litigation; [¶] (3) authorize such orders in connection with any dry cleaning site in Modesto; [¶] (4) provide that Dow and PPG's obligations under such orders shall be joint and several at all sites unless the superior court determines otherwise on a proper showing; [¶] (5) specify that Dow and PPG shall comply promptly and fully with such orders notwithstanding any right they may have, or claim to have, to seek contribution, indemnity, or similar remedies from any other party; and [¶] (6) provide that any and all factual disputes arising in connection with the injunction shall be referred in the first instance to a special master or referee to be appointed by the superior court, either by consent or pursuant to Code Civ. Proc. § 639, subd. (a)(3) ('question of fact')."

Because of the pretrial summary adjudication orders, the City could not seek this injunction in the trial court, but it contends our authority extends to fashioning this relief in the first instance. It relies on Code of Civil Procedure section 43, which authorizes appellate courts to "affirm, reverse, or modify any judgment or order appealed from," and to "direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had," and upon similar language in Code of Civil Procedure section 906.[4] The City argues that the injunction it seeks lies within our " 'inherent powers . . . to insure the orderly administration of justice.' [Citation.]" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 266.) It also contends Dow and PPG are estopped

---

[4] Code of Civil Procedure section 906 provides that in a civil appeal, "the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party, . . . and may affirm, reverse or modify any judgment or order appealed from and may direct the proper judgment or order to be entered, and may, if necessary or proper, direct a new trial or further proceedings to be had."

16

to contest an injunctive remedy because they took the position below that a public nuisance injunction was "the only proper remedy."

In the circumstances of this case, we are not persuaded that we may properly order the trial court to issue the injunction the City seeks. The nuisance causes of action against Dow and PPG have yet to be adjudicated, and the trial court has made no findings or determined any appropriate remedy. The City argues that the undisputed facts support a public nuisance injunction. Whether or not that is so, we cannot say that the undisputed facts *compel* the specific remedy the City seeks. And in any case, our role on appeal is to review the *trial court's* actions. As explained in *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 844, " '[T]he ordinary and widely accepted meaning of the term "appellate jurisdiction" is simply the power of a reviewing court to correct error in a trial court proceeding.' [Citation.] 'An appeal is not a trial but simply a method given litigants of rectifying errors, legal or factual, that may have occurred at a preceding hearing generally referred to as a trial. An appellate court is a reviewing court, and (except in special cases where original jurisdiction is conferred upon it) not a trial court or court of first instance. The jurisdiction of an appellate tribunal is generally confined to the correction of errors committed in the trial court . . . .' [Citation.]" In *Quantification Settlement Agreement Cases* the court determined that the trial court had erred in dismissing two actions under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), but declined to adjudicate the merits of those actions, noting that the trial court had not reached the merits and that the plaintiffs "have not proven to our satisfaction that we are authorized to do so in the exercise of our appellate jurisdiction under the circumstances presented here." (*Ibid*.; see also *Center for Biological Diversity v. Department of Fish & Wildlife* (2016) 1 Cal.App.5th 452, 465 [appellate court's authority extends to affirmance or reversal and modification of judgment or order].)

The City's reliance on *Waste Management of the Desert, Inc. v. Palm Springs Recycling Center, Inc.* (1994) 7 Cal.4th 478 (*Waste Management*) is unavailing. The plaintiffs in *Waste Management* sought an injunction against the defendant, prohibiting it

17

from collecting recyclable materials within the city limits of Rancho Mirage, and the defendant filed a cross-complaint seeking, inter alia, an injunction prohibiting the city from enforcing an ordinance forbidding anyone except the plaintiff from collecting such materials. (*Id*. at pp. 482-483.) The trial court granted the plaintiff's injunction, and the Court of Appeal reversed, concluding state law did not authorize the city to grant an exclusive franchise for the collection and removal of recyclable materials that were not placed into containers maintained by the city or its authorized waste collector or otherwise "discarded" by the owner. (*Id*. at p. 484.) The appellate court directed the trial court to issue an injunction prohibiting the city from enforcing the ordinance against the defendant with respect to recyclable materials that had not been turned over to the city or its agent. (*Id*. at p. 490.) The Supreme Court affirmed the judgment of the Court of Appeal but, based on its narrower view of the right of the owner of recyclables to discard them, directed the appellate court to direct the trial court to issue a narrower injunction. (*Id*. at p. 491.) Thus, in *Waste Management*, the reviewing court properly directed the trial court to prohibit a governmental entity from enforcing an ordinance to the extent it conflicted with state law, after the matter had been litigated in the trial court. That case does not stand for the proposition that an appellate court may direct the trial court to enter a mandatory injunction on a cause of action that has not yet been litigated, and directing equitable relief upon which the trial court has not yet had occasion to exercise its discretion. (See *Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 260 [permanent injunction is determination that plaintiff has prevailed and equitable relief is appropriate]; *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [trial court's decision to grant permanent injunction rests within its sound discretion].)

The City cites *POET, LLC v. State Air Resources Board* (2017) 12 Cal.App.5th 52 as support for its requested remedy but that case is inapposite. There, the Air Resources Board failed to comply with a writ of mandate the appellate court directed to be issued requiring that it comply with CEQA in promulgating certain regulations. (*Id.* at pp. 79-83.) The court also found that the Board, in failing to comply with the writ, had not acted in good faith. (*Id.* at pp. 99-100.) The appellate court therefore took the unusual step of

18

providing detailed orders to clarify the scope and meaning of the writ of mandate because, a reversal with a "generic" order reinstating the original writ "would give rise to disputes between the parties over how the writ's provisions should be applied to the further proceedings." (*Id.* at p. 88.) The court enumerated the probable disputes and concluded that "(1) a simple reversal with directions for [the Board] to comply with the writ is not appropriate and (2) further orders are needed to clarify matters." (*Ibid.*) Thus, the court in *POET* was not adjudicating any matters in the first instance—as we are being requested to do—but was clarifying what would constitute compliance with the terms of the writ of mandate, and has no application here.

While we decline the City's invitation that we craft and direct the trial court to impose a particular form of injunctive relief, we also note that the City's proposal could, at least theoretically, provide an elegant framework for resolving this matter and avoiding lengthy further proceedings. Counsel have understandably expressed frustration with the protracted litigation and the lengthy delays that have beset this matter, and to that we add our own concerns about our already overburdened courts. We, accordingly, strongly encourage the parties to consider any and all creative approaches that might put an end to the litigation.[5]

Finally, nothing we say is intended to prevent the City from urging the trial court to impose the injunction it seeks here, or from relying on any admissions Dow and PPG might have made in the course of the litigation that a nuisance abatement injunction would be a proper remedy.

---

[5] More specifically, it appears to us that if this decision becomes final there will be a finite number of sites at which remediation issues need to be addressed and, although the experts in an adversarial setting were far apart in their approaches and cost estimates, these differences are not so great as to be incapable of reconciliation or compromise. This critical juncture in the case may present the opportune moment for the experts, the parties and counsel to craft a structured, yet flexible settlement that could include an expeditious fact-finding process.

**L. Organization of Issues on Appeal**

It is common in cases such as this one, where the issues unfold over a lengthy set of proceedings below, to address the issues on appeal in the order in which they arose below, primarily because it provides an easy-to-follow temporal framework. In this case, however, we will organize the opinion by addressing, first, the issue that requires the most in-depth discussion—the question of the proper standard of causation to be used for Polanco Act claims. The remaining charges of error, which, with a few exceptions, are not substantively or legally interrelated, will be discussed in what we hope is a logical progression.

## IV. DISCUSSION

**A. *Modesto I* and the Causation Standard**

Plaintiffs contend that in the Phase IV Polanco Act bench trial, the court erred in applying an exceptionally stringent standard of causation based on its erroneous interpretation of *Modesto I*. We agree and our analysis follows.

### 1. The Precise Issue on Appeal

The judge in Phase IV concluded, based on his reading of *Modesto I*, that liability under the Polanco Act could be established *only* by direct proof of each link in a very specific chain of causation. The City challenges that conclusion and makes a cogent argument that its application was prejudicial. In response, defendants endorse the legal standard applied by the court but *do not* argue that, if there was error, prejudice was not shown. Further, the parties did not brief, and we are not asked to decide whether the evidence presented in Phases III and IV of the trial would support a finding in the City's favor if a different causation and proof standard had been applied. Consequently, we address only the narrow legal question presented, viz., whether the trial court applied an incorrect causation standard. Because this question is a purely legal one, we apply a de novo standard of review. (*Orange County Water District v. MAG Aerospace Industries, Inc.* (2017) 12 Cal.App.5th 229, 240.)

### 2. The Polanco Act

20

We begin our discussion with a summary of the Polanco Act and then provide a more detailed description of how that law was interpreted in *Modesto I.*

The trial court aptly summarized the Act's core provisions. " 'The Polanco Act involves cleanup of the release of hazardous substances in the context of a redevelopment project.' [Citation.] Subject to certain statutory conditions, the Act authorizes a redevelopment agency to 'take any actions that the agency determines are necessary . . . to remedy or remove a release of hazardous substances on, under, or from property within a project area, whether the agency owns the property or not….' [Citation.] If an agency takes such action, 'any responsible party or parties shall be liable to the [ ] agency for the costs incurred in the action.' [Citation.] An action for cost recovery under the Act 'is in addition to, and is not to be construed as restricting, any other cause of action available to a redevelopment agency.' [Citation.]" Thus, under the Polanco Act, a redevelopment agency is entitled to recover from "any responsible party or parties" the costs it incurs "to remedy or remove, or to require others to remedy or remove . . . a release of hazardous substance" including "compelling a responsible party through a civil action, to remedy or remove a release of hazardous substance." (§ 33459.4, subd. (a).)

The term "responsible party" is defined by reference to two other laws. First, the Act incorporates a provision of the HSAA (§ 25323.5, subd. (a)(1)), which, in turn, incorporates CERCLA's definition of "covered persons" for purposes of liability (42 U.S.C. § 9607(a)).[6] The City does not contend defendants (other than the dry cleaners themselves) fall within that definition. Second, the statute incorporates section 13304, subdivision (a) of the Water Code which provides, in pertinent part, that any person who "has caused or permitted, causes or permits, or threatens to cause or permit

_____

    [6] The federal statute provides that four categories of persons or entities are, in essence, strictly liable for clean-up costs resulting from hazardous substances: (1) those who own or operate the facility; (2) those who previously owned or operated the facility when the hazardous substances were released; (3) those who arranged for disposal or treatment, or for transportation for disposal or treatment, of the hazardous substances found at a treatment facility; and (4) those who accepted hazardous substances for transport, disposal or treatment at a site chosen by that person, that results in a release or threatened release. (42 U.S.C. § 9607(a).)

21

any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance" shall be responsible for remedial action. It is this definition that was the subject of our prior opinion in this matter.

### 3. The Modesto I Decision

Early on in this case, the manufacturer defendants filed a motion for summary adjudication of the Polanco Act and negligence per se claims. They argued they were not "responsible parties" under the Polanco Act because they neither themselves discharged the PCE nor did they control any site where the discharges occurred. The trial court granted the motion, ruling that the manufacturers were not "responsible parties" under the statute because in order for a party to "cause" a discharge "you have to have some sort of physical control or the ability to stop it from happening." (*Modesto I*, *supra*, 119 Cal.App.4th at p. 36.) Plaintiffs filed a petition for writ of mandate in this court, which we granted because we disagreed with the trial court's conclusion that only those who physically engage in a discharge or who control the waste disposal activities of others are liable under the Polanco Act.

In the decision, we first rehearsed the statutory language. As we have already described, the Polanco Act defines "responsible parties" by reference to Water Code section 13304, which provides: "A person . . . who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall . . . clean up the waste or . . . take other necessary remedial action . . . ." We therefore began our analysis by asking whether the word "cause" refers to "a party who was directly involved with a discharge, to anyone whose actions were a substantial factor in causing the discharge, or even, as city argued below, to anyone who places a hazardous substance into the chain of commerce." (*Modesto I, supra,* 119 Cal.App.4th at p. 37.)

To answer that question we noted, first, that environmental legislation by which government exercises its traditional power to regulate public nuisances should be

22

construed in light of common law principles bearing on nuisance, citing *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605. Determining that the Porter-Cologne Water Quality Control Act (Wat. Code § 13000 et seq.) was in fact such a legislative scheme (*Modesto I*, *supra*, 119 Cal.App.4th at pp. 37-38), we identified certain principles which would govern our construction of the statute.

The first principle, which has "long been the law in California," is that " ' "[n]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages." ' [Citation.]" (*Modesto I*, *supra*, 119 Cal.App.4th at p. 38.) Thus, "liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance. [Citation.]" (*Ibid.*)

Our second principle was a limiting one. We concluded that, "[w]hile liability for nuisance is broad, . . . it is not unlimited" and the "*City of San Diego* [*v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575] established one important limitation." (*Modesto I*, *supra*, 119 Cal.App.4th at p. 39, fn. omitted.) In that case the city sued the manufacturers, distributors and suppliers of asbestos-containing building materials that had contaminated the city's buildings, seeking recovery, inter alia, under a nuisance theory for the costs of abatement. The court concluded that the city could not maintain an action based on nuisance where it is seeking recovery for a defective product, because it would convert almost every products liability action into a nuisance claim. (*Ibid.*) The court affirmed the summary adjudication in favor of the defendants because it was " 'a products liability action in the guise of a nuisance action' [citation]." (*Ibid.*) We agreed with that conclusion, expressing the view that the law of nuisance "is not intended to serve as a surrogate for ordinary products liability." (*Ibid*. fn. omitted.)

We then proceeded to the next question: Whether, in this case, "the Polanco Act claims fall within the realm of nuisance or of products liability;" that is, "has city presented evidence that the defendants assisted in the creation of a nuisance, or *only* that they produced or supplied defective products?" (*Modesto I*, *supra*, 119 Cal.App.4th at

23

pp. 39-40 [emphasis added].)  We looked first to *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601 (*Selma*), disapproved on other grounds in *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 70.  There, the State and the Regional Water Quality Control Board sued the operators of a wood treatment facility, alleging they improperly disposed of hazardous waste.  The plaintiff sought, among other things, damages flowing from a nuisance.  (*Selma, supra,* 221 Cal.App.3d at p. 1606.)  The defendants cross-complained against the company that designed the wood treatment technique, installed the equipment, provided training and made recommendations on operations that resulted in the wood-treating chemicals being deposited into soil overlying an aquifer.  Other cross-defendants were chemical suppliers that provided "assistance and advice" and knew or should have known that the disposal could threaten the safety of the water supply, but failed to warn of those risks.[7]  (*Id.* at pp. 1607, 1609.)  The court concluded that both were potentially liable as persons who created or assisted in creating the nuisance.  The designer and installer could be liable because it had direct involvement in creating the disposal system by which the waste products were discharged into an unlined dirt pond, which could threaten the water supply.  (*Id.* at p. 1620.)  The court also held that the chemical companies could be held liable if plaintiffs proved their allegations that "the [operators] were foreseeable users; disposal of the chemical residue was a foreseeable use of the product; the chemical companies knew or should have known of the dangers of improper disposal of the chemicals; the owners did not know of those dangers; the companies failed to warn of the dangers; and that failure to warn was a substantial factor in causing the damage.  (*Selma, supra,* 221 Cal.App.3d at pp. 1621-1624.)"  (*Modesto I, supra,* 119 Cal.App.4th at p. 40.)

We agreed with the first conclusion—"that those who create or assist in creating a system that causes hazardous wastes to be disposed of improperly, or who instruct users to dispose of wastes improperly, can be liable under the law of nuisance."  (*Modesto I,*

_____

[7]  The "assistance and advice" alleged to have been received from the chemical suppliers is not described in the opinion and, as we describe below, it does not play any part in the court's liability analysis or its holding.

*supra*, 119 Cal.App.4th at pp. 40-41.) Citing plaintiffs' evidence that some of the defendants instructed the dry cleaners to set up their equipment in a way that water containing PCE would be discharged directly into drains and sewers, and other defendants "gave dry cleaners instructions to dispose of spilled PERC on or in the ground," we concluded, "these kinds of affirmative acts or instructions could support a finding that those defendants assisted in creating a nuisance, and therefore would defeat a summary adjudication motion on the Polanco Act cause of action." (*Id.* at p. 41.)

Defendants had argued that liability should be limited to those who "controlled either the discharge activity or the premises where the discharge occurred" citing to a number of State Water Resources Control Board decisions. We rejected that argument because the Board's decisions did not address "the responsibility of a party that *instructs* users to dispose of hazardous wastes in an unsafe manner or a party that *creates* a system that would result in improper disposal of hazardous wastes." (*Modesto I*, *supra*, 119 Cal.App.4th at p. 41.) We also pointed out that the State Board has concluded that even a relatively minor contribution to a discharge may support a finding of responsibility, citing *In re County of San Diego* (Order No. WQ 96-2, Feb. 22, 1996) 1996 Cal. ENV LEXIS at p. *14 (Cal.St.Wat.Res.Bd.).

At the other end of the spectrum, the City had argued that liability for nuisance can be fixed by proving only that defendants manufactured and sold solvents to dry cleaners with knowledge of the hazards of those substances and without alerting the dry cleaners to proper methods of disposal. (*Modesto I*, *supra*, 119 Cal.App.4th at p. 42.) We rejected that contention as well. We reasoned that "failure to warn [is] not an activity directly connected with the disposal of solvents. In our view, such behavior is analogous to the manufacture, distribution, and supplying of asbestos-containing materials in *City of San Diego* [*v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575]; it does not fall within the context of nuisance, but is better analyzed through the law of negligence or products liability, which have well-developed precedents to determine liability for failure to warn. [Citations.]" (*Ibid.*)

25

We, accordingly, held that "those who took affirmative steps directed toward the improper discharge of solvent wastes—*for instance*, by manufacturing a system designed to dispose of wastes improperly or by instructing users of its products to dispose of wastes improperly—may be liable under [(Wat. Code § 13304, subd (a))] but those who merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal are not liable under that section of the [code]." (*Modesto I*, *supra*, 119 Cal.App.4th at p. 43, emphasis added.) We issued a writ of mandate directing the superior court to reconsider defendants' motion for summary adjudication of the Polanco Act and negligence per se claims "in accordance with the views expressed herein." (*Id*. at p. 45.)

### *4. Defendants' Interpretation of* Modesto I *is Rejected*

On remand, the trial court reconsidered the matter, and issued a tentative decision denying the motion. The court explained: "[With regard to t]he solvent manufacturer defendants, the Court of Appeal instructed that simply placing this material in the stream of commerce without warnings would not be enough, . . . but if there were affirmative steps taken by the solvent manufacturers directed towards improper discharges, then that would be enough." The trial court found that plaintiffs had produced sufficient evidence to raise fact questions as to whether the manufacturers would be responsible parties under the Polanco Act.[8] Seeking to convince the court otherwise, defendants argued that the

---

[8] For context, here are examples of the instructions and guidance that was provided by Dow for disposal of PCE and PCE waste. Material Safety Data Sheets (MSDS's) were given to dry cleaners through distributors when they purchased PCE. In 1971 the MSDS's instructed users to flush large spills to the ground and to mop up small spills and bury them. Throughout the rest of the 1970's, the MSDS's instructed that if there were "small leaks" of PCE the user should "[m]op up, wipe up or soak up immediately. Remove to out of doors." The "disposal method" prescribed for PCE was to send it to a reclaimer, but "[i]n some cases it can be transported to an area where it can be placed on the ground and allowed to evaporate safely." Similar instructions regarding "small leaks" were provided in MSDS's issued in the 1980's. In that period, however, the MSDS's "strongly discouraged" dumping unused PCE "into sewers, on the ground or into any body of water." Dow's "Dry Cleaning: A Basic Handbook DOWPER Solvents for the '80s," providing "information and instruction" about solvent and dry cleaning

*Modesto I* opinion addressed "only the first question in the chain of causation that has to be established;" the plaintiffs must also prove, they contended, that the instructions were received by the dry cleaners, that the dry cleaners acted in response to those instructions, and that their actions in response to the instructions were actions that caused the contamination. It was defendants' position that because *Modesto I* required an "affirmative step[] . . . directed toward improper discharge," this was a "special circumstance . . . where the Court of Appeal did not accept the idea that substantial factor itself was sufficient for liability under nuisance or under the Polanco Act." Hence, defendants argued, instead of the standard substantial factor causation test, the plaintiffs must prove the instruction gets to the dry cleaner, "[t]he dry cleaner looks at it, acts on it and causes the contamination."

The trial court pointed out, however, that the question before it was not whether it could make findings on causation, but only whether there were sufficient facts that would "rationally allow a juror" to make such findings. Rejecting defendants' arguments, the trial court affirmed its tentative ruling, concluding that, under the standard articulated in *Modesto I*, a reasonable juror could find a violation of the Polanco Act based on the evidence before the court.[9]

Defendants renewed their *Modesto I* causation theory at closing argument in the first Polanco Act trial (Phase II). Relying on the word "cause" in the Water Code, defendants argued: "Causation is built right into this. So in order to find liability under that Water Code section, not only do you have to start with an instruction that's improper,

---

equipment, was among the literature distributed not just to customers, but also at trade shows, seminars and by mail. In the discussion on equipment, these handbooks indicate that contact water from the water separator is "drawn off and discarded."

[9] In their Phase I trial brief (on the strict liability and negligence claims) defendants made a similar causation argument. They argued the manufacturer had to be directly linked to a release of its product, thence to the pollution. Defendants repeated that argument in a motion for nonsuit, in closing argument to the jury, and yet again in motions for judgment notwithstanding the verdict. Neither the jury nor the judge were persuaded.

you have to get it to the site, somebody has to follow it, a release has to occur as a result, and that release has to cause the contamination that's at issue." Defendants insisted that this was precisely what *Modesto I* required.

The trial court again rejected defendants' interpretation of *Modesto I*. The judge identified the "critical inquiry" as "whether the defendants' [PCE manufacturers'] actions, taken as a whole, 'created or assisted in the creation of the nuisance.' " As that court explained, "[t]he appellate Court cited the giving of 'instructions' as an example of something that may 'assist in the creation' of a nuisance, but did not suggest that this is the only conduct that would qualify." The court noted that *Modesto I* identified one limitation on the otherwise broad liability for nuisance viz., that the law of nuisance is not intended to serve as a surrogate for ordinary products liability. It then reasoned: If " 'defendants who fail to warn of the dangers of improper disposal of hazardous materials but give no guidance or instructions pertaining to that disposal [pose] a more difficult question' [citing *Modesto I*]," then "[d]efendants who *do* give 'guidance or instruction' do *not* pose a difficult question—they are covered by the Act."

The trial court then quoted the language by which it would be guided. " '[T]hose who took affirmative steps directed toward the improper discharge of solvent wastes—*for instance* by manufacturing a system designed to dispose of wastes improperly or by instructing users of its products to dispose of wastes improperly—may be liable under the statute, but those who *merely* placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal are not liable under that section of the [Water Code].' *City of Modesto,* 119 Cal.App.4th at 43 (emphasis added)." Applying that standard, the court recited its findings: "The manufacturer defendants in this case did more than simply place their PCE products into the stream of commerce without adequate warnings. Because their PCE products were fungible, the manufacturers competed in the marketplace by touting their expertise, professionalism, and individualized services. Their customers were relatively high volume businesses that used substantial amounts of PCE on a daily basis, and the manufacturers encouraged these businesses to rely on the manufacturers' advice, instructions and expertise. The

28

manufacturers published newsletters to their customers, provided technical literature to their customers, and trained sales personnel to promote reliance by the customers on the manufacturers' expertise. [¶] …. [¶] The evidence included numerous examples of manufacturer instructions, advice, and guidance to customers to discharge separator water, which the manufacturers knew to contain PCE, into sewers, as well as to release waste PCE onto the ground.  These kinds of recommendations were repeatedly made and reinforced by the manufacturers over the course of many years and led to the recommended PCE waste handling and disposal practices being generally followed by the customers.  The effect of the manufacturers' recommendations, considered both individually and in combination, was that risky waste handling and disposal practices became the norm among customers."  The court took note of the fact that a similar course of conduct had been found by the jury in Phase I to support liability for the creation of a nuisance at one of the dry cleaner sites.

The court found, in addition, that at the time the manufacturers were holding themselves out as experts, they knew that PCE could cause groundwater contamination; that Street employees visited Modesto Steam over the course of two decades and during those visits poured PCE from "titration tests" into the drain; and that the manufacturers delayed too long in correcting their communications to their customers concerning the improper waste handling and disposal practices.  "The record, taken as a whole," the court concluded, "establishes that the manufacturer defendants are 'responsible parties' under the Polanco Act . . . because they 'created or assisted in the creation of a nuisance.' "

### 5. *Defendants'* Modesto I *Causation Theory is Accepted*

The trial court's rejection of defendants' causation theory in the first Polanco Act trial did not deter them from making the same argument in the second Polanco Act trial, presided over by a different judge.  Describing themselves as "remote manufacturers," defendants again characterized the *Modesto I* opinion as setting forth a "specific instruction test," which necessitated a showing of "an affirmative recommendation or instruction by a defendant to a dry cleaner that in turn was relied upon [] by the dry

29

cleaner to discharge material to the environment which in turn caused the contamination which occurred here." "It's not only whether affirmative instructions existed during that timeframe[,] . . . it's whether some dry cleaner came into court and said I read that instruction, and I relied on that instruction, and then whether an expert said that conduct caused the contamination we're talking about today."

The City, for its part, urged the court not to focus on the manufacturers' disposal instructions in isolation but to look at the totality of defendants' conduct over decades, in addition to the provision of instructions, to determine whether all of their activities in the marketplace, including a failure to take corrective action, could be found to have assisted in creating the PCE pollution, citing as an example, the findings of the judge in the Phase II trial. The City argued that the correct inquiry is "what did defendants do *in addition* to placing PCE into the stream of commerce without adequate warnings that would make this case more than simply a failure to warn case, and therefore subject defendants to Polanco Act [] liability?"

In the end, the trial court agreed with defendants. Although the court accurately summarized the reasoning and holding of *Modesto I*, it interpolated into that opinion the proof requirements which defendants had championed. Noting that the Polanco Act implicitly requires proof that "defendant's conduct *caused* the discharge in question," the court observed that *Modesto I* did not spell out the "kind of factual showing a plaintiff must make in order to prove that a solvent manufacturer's improper disposal instruction(s) *caused* a release of PCE. (Italics added.)" It nevertheless decided that specific proof requirements "follow" from *Modesto I*'s holding: "First, the user must have received the instruction(s). Second, the user must have disposed of hazardous waste in a manner consistent with the instruction(s). Third, the contamination for which cost recovery is sought under the Act must have been caused by a release mechanism contained in the instruction(s) and employed by the user[,] . . . since the release could have been caused by an operator acting independently of a defendant's instruction(s) or by some other event unrelated to the actions of a defendant. Finally, with respect to the release of PCE, the user must have purchased the defendant's solvent, since the

30

manufacturers in this case only provided PCE-related information to their customers and end users."

The trial court specifically rejected the City's argument that the court should consider whether other conduct—including whether defendants touted their expertise and individualized services with respect to PCE and its disposal; whether defendants promoted reliance by their customers on defendants' expertise; and whether, once defendants knew that PCE could contaminate groundwater, they failed to send out corrective information about disposal practices—to determine whether defendants were responsible parties. The court concluded that *Modesto I* neither requires nor even suggests that these factors are relevant. The court specifically rejected consideration of "whether Defendants' actions, taken as a whole, created or assisted in the creation of a nuisance." As we explain, this interpretation of *Modesto I* was incorrect.

### 6. Analysis

#### a. *Modesto I* did not address causation

To begin with, the trial court's focus on the provision of disposal instructions to the exclusion of all other potentially relevant factors is not supported by the holding of *Modesto I.* As the judge in Phase II observed, *Modesto I* held that "those who *merely* placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal are not liable," but that those who take "affirmative steps" toward the improper discharge of solvents can be liable. *Modesto I* did not preclude consideration of any other factors that might be relevant to the question of whether such a defendant "assisted in the creation of [a] nuisance." (*Modesto I, supra,* 119 Cal.App.4th at p. 38.)

More to the point, *Modesto I* simply did not address the issue of how causation must be proven. Defendants argue that *Modesto I* requires proof of a special "chain of causation," demonstrating by *direct* evidence that a specific disposal instruction was received, read and acted on by a specific dry cleaner, which act caused contamination at a specific site. In support, they cite and emphasize phrases in the *Modesto I* opinion indicating that those whose involvement in discharges is "remote and passive" or who have "no active involvement" in activity that is "directly connected with the disposal of

31

solvents" cannot be liable under the Polanco Act. But these phrases merely explain how we construed the term "responsible party" in the statute; they say nothing about proof of causation. As the trial court correctly observed, the *Modesto I* opinion did not address the quantum or nature of proof required to prove the causation element of liability. In short, nothing in the opinion either states or implies that any unusual or special causation test would apply.[10]

## b. The substantial factor test of causation

Defendants also contend, however, that the substantial factor causation test requires this same heightened standard of proof. Defendants begin by reciting some basic legal principles, such as, that liability cannot be premised on a mere possibility of causation, nor on probabilities that are, at best, evenly balanced, nor on speculation or conjecture, citing *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 775-776 and *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 490. No one disputes these principles. But this case is not akin to *Saelzler*, where plaintiff could not prove that additional security guards in a 300-unit, 28-building complex would have prevented a criminal assault (*Saelzler, supra,* 25 Cal.4th at p. 777), or *Merrill*, where plaintiff provided no evidence either "direct or circumstantial" that the promotion and marketing of a firearm

---

[10] In connection with this issue, we asked the parties to address at oral argument the nuisance jury instruction relied upon by the court in the Phase II Polanco Act trial, because the record suggested that defendants had agreed this was the applicable standard. As pertinent here, the instruction states, (1) the City claims "it suffered harm because one or more of the defendants created a public nuisance;" (2) to establish that claim the City must prove (inter alia) that a defendant *"affirmatively instructed users to dispose of wastes improperly resulting in a condition that obstructed the free use of city property,"* and that "the defendant's conduct was a substantial factor in causing harm to the City." [Emphasis added.] At oral argument, defendants contended the italicized part of the instruction separately required a heightened degree of proof of a direct link between a disposal instruction and the identified contamination. We disagree. First, as the trial court observed in Phase I, based upon this instruction and upon evidence similar to the evidence introduced against Dow, the jury found Vulcan liable for nuisance and trespass. Beyond that, the language on its face requires no such direct linkage, but only proof that defendants' disposal instructions resulted in obstructing free use of property and that defendants conduct was a substantial factor in creating that harm.

32

by a manufacturer bore any causal relation to the purchase and use of that firearm by an individual to kill various victims. (*Merrill, supra,* 26 Cal.4th at p. 489.) Defendants nevertheless argue that the principles enunciated in *Saelzler* and *Merrill* require, in this case, *direct* evidence linking a given instruction to a specific dry cleaner who would testify that he read and followed it, thence to expert testimony proving the dry cleaner's act was the mechanism of contamination. Otherwise, they argue, the evidence supports only the possibility that a defendant contributed to the contamination in a particular location. For example, defendants contend that even the conformance of a dry cleaner's disposal practices to a defendant's instructions is not sufficient to prove causation because "[s]uch happenstance does nothing more than allow for the 'mere possibility' that the defendant's instruction had something to do with the drycleaner's conduct." We do not agree that the substantial factor test of causation requires the kind of incontrovertible linkage proposed by defendants.

"Although a finding of causation may not be based on mere speculation or conjecture, such finding may be predicated on reasonable inferences drawn from circumstantial evidence." (*Smith v. Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 780.) Direct proof of each link in a chain of causation is not required. "[C]ircumstantial evidence of sufficient substantiality" from which reasonable inferences can be drawn will support a finding of causation in fact. (*Ibid.*) "Causation may in many instances be inferred from evidence that does not itself constitute direct evidence of reliance on an individual basis." (*State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 608 (*Wilson*).) "Just as factors such as the magnitude and temporal proximity of the unlawful conduct might evidence or negate the existence of fraud, so too might many of the same factors influence the extent to which an inference of causation is appropriate." (*Id.* at p. 605.)

Defendants cite *Viner v. Sweet* (2003) 30 Cal.4th 1232 (*Viner*) for the propositions that the substantial factor test subsumes the traditional requirement of "but for" causation, and that there can be no liability if any link in the chain of causation is missing. These statements are accurate, but do not answer the question posed—whether defendants'

33

"specific instruction test" is the only means of proving that defendant's conduct was a substantial factor in causing the PCE pollution. In *Viner* the trial court ruled that the usual test of causation for attorney malpractice—that the plaintiff's outcome would have been better but for the attorney's negligence—did not apply to malpractice in the performance of transactional work. (*Viner*, *supra*, 30 Cal.4th at p. 1238.) The court of appeal affirmed, holding that "a plaintiff suing an attorney for transactional malpractice need not show that the harm would not have occurred in the absence of the attorney's negligence." (*Id*. at p. 1240.) The Supreme Court disagreed. The court of appeal effectively removed causation from the liability matrix, and that was error.

In *Viner* the high court found no reason to except transactional malpractice from the traditional "but for" standard applied in malpractice cases. (*Id*. at pp. 1240-1242.) It went on, however, to caution that "the plaintiff need not prove causation with absolute certainty. Rather, the plaintiff need only ' "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." ' [Citation.]" (*Id*. at p. 1243.) And, of course, "the plaintiff may use circumstantial evidence to satisfy his or her burden." (*Id*. at p. 1242.)

So, for example, in *Wilson*, plaintiff brought a qui tam action against a drug company (BMS) alleging it provided lavish gifts to physicians and members of formulary committees to induce them to prescribe BMS's drugs. Plaintiff alleged that "as a result of kickbacks BMS provided to them" the physicians and formulary committees selected BMS's drugs, and submitted insurance claims therefor, in violation of a statute prohibiting the employment of persons to procure patients to obtain insurance benefits. (*Wilson*, *supra*, 227 Cal.App.4th at p. 587.) The trial court granted summary adjudication on the following question: Assuming BMS provided an "item or service" of value to a doctor, and the doctor thereafter prescribed BMS's drugs, is the statute violated "absent proof that the item or service caused the prescription." (*Id*. at p. 589.) The trial court ruled that it was "not enough to prove that the unlawful conduct was a substantial factor resulting in the prescription." (*Id.* at p. 590.)

34

The court of appeal reversed. It concluded the trial court erred when it ruled that plaintiffs must establish not only that BMS's conduct was a substantial factor resulting in the prescriptions, but also that it was *essential* to the result, i.e., "that if the prescription would have been written even without BMS's unlawful inducement, the unlawful conduct cannot be found to have caused the prescription and claim." (*Wilson*, *supra*, 227 Cal.App.4th at p. 607.) The appellate court observed that the trial court's standard would make proof of an unlawful claim almost impossible to establish. (*Ibid.*) The court also noted that but-for causation is not required where there may be, as in that case, independent concurrent causes. (*Ibid.*)

Similarly, in *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51 (*Stevens*), plaintiffs' family member died after her physician prescribed a drug manufactured by Parke, Davis, due to a condition induced by the drug. In addition to suing the prescribing physician, plaintiffs successfully sued Parke, Davis for "overpromoting" the drug, and "watering down" the warnings concerning the drug's link to the fatal condition. In the supreme court, the drug company argued its overpromotion and watered-down warnings were not proven to be the cause of death because the prescribing doctor admitted he was aware that the drug had been linked to the condition and that its "prolonged administration carried some danger of fatality." (*Id.* at pp. 66-67 & fn.15.) The doctor had also testified that he obtained that information from articles in medical journals and from discussions with fellow physicians, and he could not remember specific instances in which he received any information, promotional or otherwise, directly from Parke, Davis, although he had received visits from drug salesmen and read journals which contained advertisements for the drug. (*Id.* at p. 68, fn. 16.)

The court affirmed the jury's verdict. It concluded there was "adequate circumstantial evidence in the record…to support a reasonable inference by the jury that [the physician] was induced to prescribe the drug for [the decedent] because of Parke, Davis' overpromotion. Like many others of the profession, he had been exposed to the

promotional tactics employed by Parke, Davis. It is reasonable to assume that the company's efforts consciously or subconsciously influenced him."[11] (*Stevens*, *supra*, 9 Cal.3d at p. 68; see also, *Toole v. Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 705 [trial court correctly rejected defendant's proposed special causation jury instruction requiring a direct causal link between plaintiff's injury and defendant's violation of law].) These authorities support the conclusion here that direct proof of every link in the chain of causation, on a site-by-site and instruction-by-instruction basis, is not required. Liability can be proven by sufficient circumstantial evidence that would allow a reasonable fact-finder to find that all of defendants' conduct—to include affirmative steps toward the discharge of toxic wastes—was a contributing factor to the pollution. As has been noted, "the State Water Board has concluded that even a relatively minor contribution to a discharge may support a finding of responsibility." (*Modesto I, supra,* 119 Cal.App.4th at p. 41.)

As in *Stevens*, the absence of proof that a dry cleaner consciously followed an improper disposal instruction—or even a statement that a dry cleaner did not rely on a disposal instruction—does not ipso facto break the chain of causation. To be sure, it was the dry cleaners and not the manufacturers who discharged the PCE. But " ' "[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." [Citation.] Thus, "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor" (citation), but a very minor force that does cause harm is a substantial factor' (citation)." (*Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, 1123.)

---

[11] The court also alluded to expert testimony that advertising and promotion of the drug "played a role" in inducing physicians to prescribe the drug when it was not sound practice to do so. But the court appeared to conclude that even in the absence of that testimony, the jury could find that the doctor's negligent prescription of the drug was a "foreseeable consequence of the extensive advertising and promotional campaign." (*Stevens*, *supra*, 9 Cal.3d at p. 69.)

Defendants also contend that product identification is, itself, always required for liability because one manufacturer may not be held liable for the injury resulting from another manufacturer's product. (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 (*O'Neil*).) There are exceptions, however, and one is where "the defendant's own product contributed substantially to the harm…or because the defendant participated substantially in creating a harmful combined use of the products." (*Id.* at p. 362.) Defendants, in any event, are not contending there was no product identification at the Phase IV sites; they are contending that it was not proven by direct evidence that during the years their product was provably sold at any Phase IV site, an improper disposal instruction was disseminated. Connecting those dots is one way to prove causation; but other evidence, both direct and circumstantial, can also demonstrate that the manufacturers' instructions and other conduct were substantial factors in causing the pollution. Thus, in keeping with common law nuisance principles (*Modesto I, supra,* 119 Cal.App.4th at p. 38), "[i]n the ordinary case, the liability . . . arises because one person's acts set in motion a force or chain of events resulting in the invasion. The acts may be a direct and immediate cause of the invasion, …or they may be an indirect cause of the invasion. . . ." (Rest.2d Torts, § 824, com. 6, p. 116.)

Finally, defendants argue that permitting abatement liability to be imposed on manufacturers without proof of each causal link—"that a specific affirmative instruction was received, read, and acted on by a particular drycleaner, and then resulted in contamination at a given site"—would be adverse to public policy, citing *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037 (*Ferguson*) and *O'Neil*, *supra*, 53 Cal.4th 335. Neither these authorities nor any such policy issues control here.

In *Ferguson*, our high court held that allowing plaintiffs in a malpractice action to recover, as compensatory damages, the punitive damages their attorneys failed to recover from the tortfeasor, would violate public policy in various ways. Primarily, it would contravene the entire purpose of punitive damages which is not to compensate the plaintiff but to punish the tortfeasor and deter him or her from similar egregious conduct. (*Ferguson*, *supra*, 30 Cal.4th at p. 1046.) In addition, it would exact too great a social

37

cost because it would hinder the courts' ability to manage and resolve mass tort claims, increase the cost of malpractice insurance, and discourage the use of mandatory non-opt-out class actions for punitive damages. (*Id.* at pp. 1049-1050.) None of these considerations apply here.

In *O'Neil*, the plaintiff had not been exposed to any asbestos-containing product manufactured or sold by the defendant, but only to the products of others used to replace, many years later, the packing and gaskets in defendant's pumps and valves. The court declined to impose liability because a manufacturer could not " 'reasonably be expected to foresee the risk of latent disease arising from products supplied by others that may be used with the manufacturer's product years or decades after the product leaves the manufacturer's control.' " (*O'Neil, supra*, 53 Cal.4th at pp. 364-365.) The court further reasoned that imposing a duty on such an attenuated basis would not be consistent with public policy, not only because the manufacturer's conduct was lacking in moral blame, but also because such a duty would not be likely to prevent future harm, and it was "doubtful that manufacturers could insure against the 'unknowable risks and hazards' lurking in every product that could possibly be used with or in the manufacturer's product." (*Id*. at p. 365.) Again, no such concerns are at play here.

Defendants cite to the principle that " 'proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." ' [Citation.]" (*Ferguson, supra*, 30 Cal.4th at p. 1045.) But defendants have not applied that principle to the facts of this case nor to their causation argument. Defendants have asserted no *policy* reasons for restricting their liability here; instead they merely repeat their claim that *Modesto I* intended to impose this "restriction[] on nuisance liability." But we have rejected defendants' interpretation of *Modesto I,* and it provides no support for defendants' policy argument. If anything, the social costs of limiting the responsibility of chemical manufacturers under defendants' formulation would fall far too heavily on the victims of the pollution by setting an almost insurmountable standard for proving liability. (Cf. *Wilson, supra,* 227 Cal.App.4th at p. 607.)

The measure of proof for causation should be no different here than that applied in any other similar action.  As noted previously, the plaintiff need only " ' "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." ' [Citation.]" (*Viner*, *supra*, 30 Cal.4th at p. 1243; accord, *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51.)

### c. CERCLA Liability Standards Do Not Apply

The City advanced below and advances here an alternative argument to support causation.  It contends that the Polanco Act incorporated by reference CERCLA's "scope and standard of liability" (§ 33459.4, subd. (c)) and therefore, under CERCLA case law, the defendants bear the burden of proving that they did not cause the release that triggered the response costs, citing *United States v. Alcan Aluminum Corp.* (2d Cir. 1993) 990 F.2d 711, 721 (*Alcan*).  The trial court correctly rejected that argument.  As was explained in *Redevelopment Agency v. Salvation Army* (2002) 103 Cal.App.4th 755, section 33459.4 of the Polanco Act incorporated CERCLA's *liability* standards, "to wit, strict liability regardless of knowledge or intent [citation], joint and several liability [citation], and retroactive liability [citation]." (*Id.* at p. 766.)  But these liability standards do not negate or supplant the requirement to prove causation.  As we have explained, the Polanco Act incorporates by reference the HSAA/CERCLA categories as one set of "responsible parties" but plaintiffs do not contend defendant manufacturers fall within any of those categories.  The shifting burden of proof found in those schemes only applies in that context.  (See *Orange County Water District v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 306-309 [CERCLA and HSAA govern liability for specific categories of defendants; as to those defendants once a plaintiff has proven that a release has occurred at a site and has triggered response costs, the burden of disproving the provenance of the discharge shifts to the defendant]; see also *Asarco LLC v. NL Industries, Inc.* (E.D. Mo. 2015) 106 F.Supp.3d 1015, 1031 [if a defendant fits into one of the four categories of responsible parties " 'it is enough that response costs resulted from

39

"a" release or threatened release—not necessarily the defendant's release or threatened release' "].)  The HSAA and CERCLA liability standards do not apply here.

### 7. Conclusion

Defendants and the trial court in Phase IV construed the *Modesto I* case as creating a special causation rule under the Polanco Act for chemical manufacturers, i.e., that liability in such a case could be proven only by direct proof that a dry cleaner received and read a *specific* instruction regarding disposal of the product waste; the dry cleaner *testifies* that (s)he followed that instruction; and an expert testifies that *that* discharge caused contamination.  This is not a fair reading of the opinion.  Had this been the holding of *Modesto I*, we could have provided a special standard for proof of causation. Instead we set forth only a standard of liability:  "Those [manufacturers] who took affirmative steps directed toward the improper discharge of solvent wastes—for instance, . . . by instructing users of its products to dispose of wastes improperly—may be liable under that statute. . . ."  (*Modesto I*, *supra*, 119 Cal.App.4th at p. 43.)  We excluded from that liability those who *merely* placed solvents in the stream of commerce and failed to warn of the dangers of improper disposal.

The circle of liability for Polanco Act claims was thus drawn to exclude mere failure-to-warn product liability, but to include a manufacturer that takes "affirmative steps toward disposal," for example, by providing improper instructions, and whose conduct "assists in creating" a nuisance.  That formulation does not change the causation analysis, which is, considering the evidence as a whole, it is more likely than not that defendants' improper instructions, and any other relevant conduct, were a substantial factor in causing the pollution.  Because the trial court imposed a far more stringent proof of causation requirement in the Phase IV trial, we shall vacate that portion of the judgment.

40

Under the substantial factor test there may or may not be sufficient evidence to support liability for the Phase IV sites but that question has not been put to us, and will have to be resolved on remand.[12]

## B. Summary Adjudication of the Nuisance and Trespass Claims

As we described in the procedural history, Dow, PPG and others filed a motion for summary adjudication on the nuisance and trespass claims which was granted as to Dow and PPG. The trial court ruled that liability for nuisance required evidence that the defendants had control over the solvent use and disposal activities of the dry cleaner or direct involvement in the design of unsafe disposal systems or dry cleaning equipment. Proof that the manufacturers were aware of the hazards of solvents and provided insufficient or inaccurate instructions and warnings concerning their use and disposal, the court determined, was not enough for nuisance liability. The City filed a petition for writ of mandate in this court seeking interlocutory review of the ruling, and the petition was summarily denied.

Dow, PPG and others then filed a motion for summary adjudication of the Polanco Act claim. The trial court granted the motion as to Dow and PPG, again concluding that plaintiffs' evidence did not show that these defendants "either directly participated in or exercised authority or control over on-site activities or disposal activities at Modesto dry cleaners."

Plaintiffs again filed a petition for writ of mandate seeking review of the trial court's order. We granted the petition, vacated the trial court's ruling and remanded the matter for a new hearing on the motion. We concluded that the Polanco Act should be construed in harmony with the principles of nuisance; that pursuant to those principles

---

[12] It is reasonable to expect that on remand liability could be found if the correct causation standard is utilized. This is because: (1) the vast bulk of the evidence pertaining to the Polanco Act bench trials was presented during the preceding jury trials (Phases I and III); (2) application of the traditional causation test resulted in a finding of liability under the Polanco Act in Phase II based on the evidence in Phase I; and (3) according to *defendants*, the "same facts" were adduced in Phases I and III.

41

" ' "[n]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages;" ' " and that a defendant who provides improper instructions to users regarding the disposal of a toxic chemical can therefore be liable under the Polanco Act.

After remand, the trial court denied Dow and PPG's motion on the Polanco Act claim. It rejected, however, plaintiffs' request that the court reconsider its order on the nuisance motion in light of *Modesto I*. The court ruled there was no basis for reconsideration. It explained, "I don't think their discussion of nuisance…in the Polanco Act matter is new law. . . . They're analogizing it to existing law, which I assume they applied when they denied the writ [on the nuisance ruling]." In effect, the court treated our summary denial of the petition challenging the nuisance ruling as a decision on the merits. This is manifestly incorrect. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 897-899.) It is also clear from the record that *Modesto I* rejected the trial court's rationale for granting not just the Polanco Act summary adjudication but the nuisance and trespass summary adjudication as well. Accordingly, it was plain error to deny the motion for reconsideration after *Modesto I* was decided.

The City asserts the denial of reconsideration was error, and defendants essentially concede the point. Below, defendants did not oppose *reconsideration* of the ruling but only argued that upon reconsideration, the court should reach the same result because plaintiffs could not show that defendants were liable under the principles outlined in *Modesto I*. Similarly, on appeal, defendants do not argue that the trial court's denial of reconsideration was not error; rather, they contend the court's ruling was not prejudicial because plaintiffs cannot prove that defendants "caused" the nuisance. This argument is based entirely on defendants' interpretation of *Modesto I* and their distinct theory of what proof is required to prove causation both for nuisance and for the Polanco Act. Because we have concluded that neither *Modesto I* nor traditional causation analysis requires the kind of proof advocated by defendants, the trial court's failure to grant the reconsideration motion was manifestly prejudicial, precluding plaintiffs from pursuing a key cause of action and remedy against the defendants.

42

We therefore vacate the order denying the motion for reconsideration and remand with directions to reconsider and deny the motion for summary adjudication on the nuisance claims.[13]

## C. Challenges to Award of Punitive Damages

Both the City and Dow raise challenges to the award of punitive damages. The City contends the trial court erred in reducing the jury's award, and Dow contends punitive damages should not have been imposed at all.

### 1. Background

After the Phase I trial, the jury awarded to the City its costs of conducting environmental investigations, of developing and implementing an appropriate remedy, and of past and future well-head filtration costs. The sums awarded were: $1,384,000 for City well number 3, $1,659,534 for City well number 21, and $130,300 for Coffee Plaza, for a total compensatory damage award of $3,173,834. The jury also found that Dow, Vulcan and Street had acted with malice, and assessed $75,000 in punitive damages against Street, $75,000,000 against Dow and $100,000,000 against Vulcan.

Dow, Vulcan and Street separately moved for judgment notwithstanding the verdict (JNOV) and for a new trial. We are concerned here only with Dow's punitive damage award.

In its motion for JNOV, Dow argued, inter alia, that there was no substantial evidence to support either a finding of malice or a finding that any malicious act was done by an officer, director or managing agent. In its motion for a new trial, Dow also argued that the punitive damages award should be vacated or reduced because it was excessive.

The trial court denied the motions for JNOV. The court ruled that there was "substantial evidence supported the jury's findings that, under the standard of clear and convincing evidence, defendants Vulcan, Dow and Street acted with malice in the

---

[13] The City's briefs nowhere request reversal of, or even mention, the summary adjudication of the trespass claim. We, therefore, do not consider whether that ruling was in error.

wrongful conduct that caused harm to the City." It also concluded that there was substantial evidence to support a finding, under the clear and convincing standard, "that one or more officers, directors, or managing agents of the three corporations (a) committed the offending conduct, (b) authorized the conduct with knowledge of its malicious nature, or (c) knowing of the conduct and its malicious nature, nevertheless adopted or approved it after it had occurred." Dow appeals that order.

In connection with the motions for new trial, the trial court reduced the award as to Dow and Vulcan to a total of $12,695,336, of which $5,441,221 was assessed against Dow.[14] The court concluded that the jury "clearly" should have reached a different verdict on the amount of punitive damages, that this total punitive damage amount—four times the compensatory damage award—represented the maximum award consistent with the constitutional right to due process and that, in the court's independent assessment, this amount was fair and reasonable. This amount was allocated between Dow and Vulcan in proportion to the respective punitive damages awarded by the jury.[15] The City challenges the trial court's reduction of the punitive damages award. Because we conclude Dow's JNOV motion should have been granted, the City's appeal on this issue is moot.

### 2. Legal Standards

Punitive damages may be awarded "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) "As defined in the punitive damages statute, '[m]alice' encompasses 'despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights and safety of others,' and '[o]ppression' means 'despicable

---

[14] Street also moved for JNOV. The trial court denied Street's motion as well. Street did not move for a new trial.

[15] The jury had awarded punitive damages of $100,000,000 against Vulcan and $75,000,000 against Dow. Based on these proportions, the trial court concluded Vulcan should bear 57.14 percent of the $12,695,336 total punitive damage award (or $7,254,115) and Dow should bear 42.86 percent (or $5,441,221).

conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.' (Civ. Code, § 3294, subd. (c)(1), (2).).… [¶] Under the statute, 'malice does not require actual intent to harm. [Citation.] Conscious disregard for the safety of another may be sufficient where the defendant is aware of the probable dangerous consequences of his or her conduct and he or she willfully fails to avoid such consequences. [Citation.] Malice may be proved either expressly through direct evidence or by implication through indirect evidence from which the jury draws inferences. [Citation.]' [Citation.]" (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1299; see also *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725.)

" '[T]o establish malice, it is not sufficient to show only that the defendant's conduct was negligent, grossly negligent or even reckless. [Citation.] There must be evidence that defendant acted with knowledge of the probable dangerous consequences to plaintiff's interests and deliberately failed to avoid these consequences.' [Citation.]" (*Gawara v. United States Brass Corp.* (1998) 63 Cal.App.4th 1341, 1361; see also *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 368 [" 'Mere . . . negligence, *even gross negligence is not sufficient to justify an award of punitive damages.* [Citations.]' "].)

Moreover, there are limitations on a corporation's liability for punitive damages flowing from the acts of its employees. As pertinent here, an employer is not liable for punitive damages based on the action of an employee "unless the employer . . . authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).) A managing agent must be more than a supervisory employee, but can be "someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573 (*White*).) This element of corporate

45

liability, as well, must be proven by clear and convincing evidence. (*Barton v. Alexander Hamilton Life Ins. Co. of America* (2003) 110 Cal.App.4th 1640, 1644.)

A jury's award of punitive damages "must be upheld if it is supported by substantial evidence. [Citations.] As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference*, and *resolving conflicts* in support of the judgment.' [Citation.] But since the jury's findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden. In other words, we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence. . . .' [Citation.]" (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.)

### 3. The City's "Managing Agent" Theory

The trial court did not specify what conduct it believed the jury found to be malicious, nor did it identify under which of the three "managing agent" scenarios— committed, authorized or ratified—Dow was found to be liable for punitive damages. Accordingly, we look to the City's arguments on appeal to ascertain what evidence it contends supported a finding of malicious conduct by an officer, director or managing agent of Dow.

The City's theory can be summarized as follows: Dow employed "product stewards" who were responsible for knowing and understanding the health, safety, and environmental aspects of the chemicals for which they were stewards. The product stewards for PCE were involved in the preparation of MSDS's and other documents that contained the improper instructions pertaining to the use, handling and disposal of PCE. The product stewards' conduct was malicious because they knew, since at least 1978, that the instructions for disposal of PCE contained in the MSDS's would lead to groundwater contamination. These product stewards were "managing agents" because they were given "ultimate authority and broad discretion" to create the MSDS's and other Dow communications. Therefore, the jury could reasonably find they were effectively

46

formulating ad hoc corporate policy on Dow's warnings and instructions concerning PCE. [16] Remarkably, the City's key contention—that the product stewards had "ultimate authority" and "broad discretion" to create the MSDS's and other Dow communications is unsupported by a single citation to the record and our own search of the record has found none.

The City correctly states that it is the product steward's job to "basically know everything there was to know about a particular chemical," and to be "involved in" formulating the company's instructions about PCE disposal. As explained by one product steward, his job was to "read and understand health and safety and to some extent environmental information associated with the product[] . . . and help develop information for communication to folks who might . . . buy or use those products."

The City goes on to argue, however, without any citation to the record, that the product stewards "were given the *ultimate authority* and *broad discretion* to create Dow's communications to all of its customers. They determined Dow's instructions about the handling and disposal of PCE, and *made the decisions* over more than a decade not to warn about environmental hazards they knew about, and to promulgate inadequate and

---

[16] The trial court denied the defendants' motions to set aside the finding of malice having concluded that the "conduct…found by the jury to be malicious…occurred over many years and involved numerous persons within each of the corporations," and so there was "non-speculative circumstantial evidence sufficient to [support a finding by] clear and convincing [evidence], that the relevant information in fact 'moved upward to a point where corporate policy was formulated' [quoting *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, judg. vacated and cause remanded in *Ford Motor Company v. Romo* (2003) 538 U.S. 1028]." The *Romo* opinion, however, was vacated in its entirety by the United States Supreme Court, and therefore is not citable precedent. (See *People v. Hamilton* (1988) 45 Cal.3d 351, 363.) Further, in *Romo* there was evidence that the top executives within one of Ford's divisions (light trucks) were responsible for the malicious decision making involved in that case. Here, in contrast, the trial court ruled that conduct involving "numerous persons" over "many years," without more, supported a finding that corporate policy was formulated.

improper disposal instructions."[17] (Emphasis added.)  The City repeats this assertion verbatim, 13 pages later, again without citing to the record.

Yet a third time, responding to Dow's contention that there was no evidence the "product stewards had authority to set corporate policy or to disregard [Dow's] product stewardship policies," the City argues that "the jury . . . could have reasonably found to the contrary based on the *broad authority and discretion* of product stewards in issuing Dow's PCE instructions." (Emphasis added.)  Again, no record citation is provided for this assertion.

"In sum," the City concludes, " 'a reasonable jury could have found by clear and convincing evidence that product stewards had the authority to form corporate policies regarding the warnings for Dow's products, and thus had 'substantial independent authority and judgment over decisions that ultimately determine corporate policy.' (*White, supra*, 21 Cal.4th 563, 573.)"

We have searched the record in vain for anything other than a few snippets of support for the City's contention that Dow's product stewards had "broad discretion" and "ultimate authority" over the warnings and disposal instructions contained in the MSDS's or in any other Dow literature.  Stanley Dombrowski, who was product steward and later chief product steward for inorganic chemicals, described his involvement with the Dow documents in this way:  "With the help of technical experts in individual fields, like toxicologists or physicians or epidemiologists or environmental chemists . . . [I authored]

---

[17]  The City elsewhere argues that "product[] stewards were given broad authority by Dow's president to determine what was communicated as Dow policy to all customers about PCE disposal and environmental issues.  By virtue of the authority given and their function, product stewards were managing agents."  The only record cite to evidence (as opposed to argument) is to the testimony of a product steward that the City *characterizes* as describing his "broad authority over Dow's communications to customers."  The actual testimony, however, was that the product steward's job was to "*facilitate and participate in the process* of developing the information and communication process to purchasers and users of those chemicals." (Emphasis added)  There is no evidence that Dow's president conferred any authority on product stewards to be the decision makers with respect to the content of Dow's communications on any subject.

48

summations of information in layman language with their help and guidance for inclusion in literature, published product literature, maybe even personal letter of communications." With respect to the MSDS's in particular, Dombrowski was asked whether, as product steward or chief product steward, he had "either direct responsibility for preparing Material Safety Data Sheets for perc, or supervising others." He responded only that he was "directly involved in the[ir] preparation. . . ."

Another product steward, Laurence Lee, was asked how MSDS's were reviewed and approved by the company before they were released to customers. He stated, "they would be created by our regulatory group that had access to the tox[icology] data, to the environmental data. A Safety Data Sheet draft would be created, it would be routed to the Environmental Health and Safety group. It would be routed to the product steward. It would be routed to several other people in the corporation. And comments would be taken and then . . . any discrepancies or differences would be resolved, and then it would be released for publication."

Janet Hickman, the PCE product steward since 1991, testified that her job was to "help facilitate carrying out [Dow's] Product Stewardship Program" and that part of her work was "viewing documents that are provided to Dow customers," including MSDS's and Spotnews. She was listed on "some of the documents" as someone customers can contact to get information. When asked if she was "basically the clearinghouse" for calls from PCE purchasers, she responded, "[p]eople can certainly call me, yes." She stated that she works with toxicologists, medical doctors ("periodically") and environmental scientists ("periodically"). She is not the person "in charge of giving answers to customers" but she is the person "in charge of developing answers. Many people can give the answers." With respect to a 1995 MSDS, Hickman was asked, "[a]nd this was prepared by a number of Dow employees to make sure that it was accurate, including toxicologists and medical doctors and so on? A. Yes, a number of people reviewed this. Q. Including professionals in the disciplines I mentioned? A. Correct."

We see nothing in this evidence to support the City's contention that the product stewards had either "broad discretion," or "ultimate authority," or decision making power

49

over Dow's communications about the handling and disposal of PCE. In short, there is no evidence to support the City's assertion that the product stewards "*made the decisions over more than a decade not to warn about known environmental hazards, and to promulgate inadequate and improper disposal instructions.*" (Emphasis added.) From the testimony one can conclude, at most, that product stewards were charged with being knowledgeable about PCE, and were involved in preparing MSDS's and other communications. The evidence simply cannot be described as substantial evidence to support a finding, by clear and convincing evidence, that the product stewards " 'exercised authority that resulted in the ad hoc formulation of corporate policy' on Dow's warnings and instructions about PCE [quoting *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 373 (*Davis*)]."

Nor has the City cited to any evidence showing that the information included in the MSDS's was known to, authorized by or ratified by any officer, director or managing agent. So far as we can ascertain, the record is silent on this question, as it relates to Dow. This is in contrast to evidence pertaining to Vulcan's issuance of MSDS's which, apparently, required the signature of multiple high-level management persons: "These are all the executives, managers, vice-presidents who had to sign off on one Material Safety Data Sheet going out to the customers, including the vice-president of marketing, the vice-president of research and engineering, the vice-president of manufacturing, [and] the division president."[18]

The City relies on *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 (*Egan*), and *Davis v. Kiewit Pacific Co.*, *supra*, 220 Cal.App.4th 358 to support its contention that an employee need not be in a "high-level policy making" position to be a managing agent. But while the cited principle is true, the facts of *Egan* and *Davis* are inapposite.

---

[18] We say "apparently" because Vulcan is not a party to the appeal, and so, much of the evidence relating to Vulcan is not included in the record. The quoted statement is from the City's closing argument to the jury.

In *Egan*, the plaintiff's disability claim was denied in bad faith by two employees of the insurance company. (*Egan, supra,* 24 Cal.3d at pp. 816-817.) On appeal, the insurance company challenged the punitive damages awarded in the trial court on the ground, inter alia, that the individuals responsible were not managing agents because "neither was involved in 'high-level policy making.' " (*Id.* at p. 822.) The court rejected that argument stating that the critical inquiry was not the employees' level in the corporate hierarchy, but "the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy. When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation." (*Id.* at pp. 822-823.) The record showed that one of the employees was the manager of the Benefits Department who had "ultimate supervisory and decisional authority regarding the disposition of all claims . . . [in] the Los Angeles office." (*Id.* at p. 823.) Although the other employee claimed he had acted "at the direction of some higher authority," he could not recall who gave him that direction, the files contained no written directive, and there was no "identifiable person in authority at [the] home office to receive and review [his] reports." (*Id.* at p. 817.) The court, accordingly, concluded the record showed he also had the kind of broad discretion and authority that "necessarily results in the ad hoc formulation of policy." (*Id.* at p. 823.)

In *Davis*, the plaintiff was part of Kiewit's 100-person construction crew working on a 12-mile segment of canal excavation and construction. (*Davis*, *supra*, 220 Cal.App.4th at p. 360.) She was subjected to discriminatory treatment and harassment both by her foreman and other workers. (*Id.* at p. 361.) The plaintiff complained to the project manager, who was defendant's "highest ranking employee on the site" about the difficulty of accessing portable toilets, which were often located "miles from the work area." The project manager stated he would look into it, but neither he nor anyone else followed up on the issue. (*Ibid.*) After one particularly serious incident of harassment she complained to her foreman and to the day shift superintendent, who in turn reported it to his superior. The project manager learned of the incident on the following day, but no

51

one investigated the matter to determine who was responsible.  (*Ibid.*)  The plaintiff also complained to Kiewit's equal employment opportunity (EEO) officer regarding both matters and expressed concern about retaliation because she had lodged a complaint with Cal-OSHA about the toilets.  The EEO officer did not take any action to prevent retaliation.  (*Ibid.*)  Shortly thereafter Kiewit laid off most of the excavation crew, including the plaintiff, but one week later selectively rehired a full day shift.  Davis was not rehired.  Davis sued for compensatory and punitive damages.  (*Id*. at pp. 361-362.)

Defendant successfully moved for summary adjudication on the claim for punitive damages, relying on declarations from the project manager and the EEO officer that they had no "substantial discretionary authority over decisions that determine [Kiewit's] corporate policy."  (*Davis*, *supra*, 220 Cal.App.4th at p. 362.)  The court of appeal reversed.  Plaintiff's opposing evidence showed that the project manager was "Kiewit's top management employee in charge of the $170 million project;" that all managers on the project reported to him; that his duties included contract administration, operations and personnel oversight, and meeting with project stakeholders; and that he had "broad discretion relating to personnel issues and the allocation of resources to meet project goals."  (*Id.* at p. 367.)  Further, there was no evidence that "management of a $170 million project with supervision of 100 employees is an insignificant part of Kiewit's business."  Accordingly, the court concluded, "a trier of fact could reasonably infer from the above evidence that [the project manager] 'exercised substantial discretionary authority over [significant] aspects of [Kiewit's] business' and therefore was a managing agent of Kiewit.  [Citing *White, supra,* 21 Cal.4th at p. 577.]"  (*Id.* at p. 370.)

As for the EEO officer, Kiewit's policy manual expressly made him responsible for "the investigation of any complaint of discrimination and the implementation of any necessary corrective action, the dissemination of the EEO Policy . . . , [and] the periodic review of [Kiewit's] employment records and practices to assure that [Kiewit's] . . . EEO Policy [is] being administered on a nondiscriminatory basis. . . ."  (*Davis*, *supra*, 220 Cal.App.4th at p. 373.)  The EEO officer himself testified that it was his duty was to "administer[] Kiewit's policies that prevent discrimination, retaliation, and harassment

52

based on gender and other protected groups for the Northwest District," and that he trained supervisory personnel, responded to employee complaints, and conducted or oversaw investigations regarding alleged discrimination, retaliation, and harassment. (*Id.* at pp. 372-373.) Based on all of the evidence, the court concluded a jury could find that the EEO officer had "authority and discretion" in making, interpreting, and applying Kiewit's policies, that he exercised his authority and discretion to not enforce Kiewit's policy against retaliation and/or to not protect the plaintiff from retaliation, "and, in so doing, exercised authority that resulted in the ad hoc formulation of corporate policy." (*Id.* at p. 373.)

These cases stand for the proposition that a managing agent is not *only* a person who sits high in the corporate hierarchy and devises formal corporate policies; if the evidence shows that a person has actual, unsupervised authority and broad discretion to implement (or ignore) corporate policy then he or she can, in this manner, be formulating "ad hoc corporate policy." But we have found no evidence that the product stewards were either given or exercised "ultimate authority" or "broad discretion" in formulating Dow's warnings and disposal instructions in its communications about PCE. The evidence showed this was a collaborative exercise, and there is no evidence that the product stewards had decision-making power over the content.

Finally, the City argued that "[t]hese were instructions issued for decades along with Dow's products, as part of Dow's claimed expertise on its products." Therefore, the City argues (quoting from Dow's brief), "[t]his case is far from one involving only 'transitory decision-making on individual items' where ' "[n]o evidence was presented regarding [the]…duties or authority" ' of the employee alleged to be a managing agent. [Citations.]" The portion of Dow's brief from which the City drew this quotation, in turn, quoted *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 63 (*Gelfo*).

In *Gelfo,* the appellate court upheld a directed verdict in favor of defendant on the issue of punitive damages. It concluded that there was insufficient evidence to support a finding that a "corporate decision maker" had been involved in improperly rescinding plaintiff's job offer. Although the individual who withdrew the offer had the title of vice-

53

president, "Gelfo did not introduce any evidence to establish his position in Lockheed's corporate hierarchy. No evidence was presented regarding [his] duties or authority, let alone substantial evidence, that [he] 'exercise[d] substantial discretionary authority over decisions that ultimately determine corporate policy.' [Citation.]" (*Gelfo*, *supra*, 140 Cal.App.4th at p. 63.) The City cannot distinguish *Gelfo*. While the City did introduce evidence of the product stewards' duties, there was no evidence to establish their position in the corporate hierarchy—in a company with 40,000 to 50,000 employees—and "[n]o evidence[,] . . . let alone substantial evidence, that [they] 'exercise[d] substantial discretionary authority over decisions that ultimately determine corporate policy.' "[19] (*Ibid*.)

We are loath to overturn a jury's finding under any circumstances, and particularly a finding that punitive damages should be imposed due to the reprehensible conduct of a corporate actor. But we must operate within the bounds of the record that has been provided and within controlling legal principles.

As to the law, the legislature has determined that, for a corporation to be liable for exemplary damages, the wrongful acts giving rise to those damages must be committed

---

[19] The jury may have been swayed by the City's closing argument, in which counsel explained that, "[w]ithin Dow, *just like within Vulcan*, there's a process for these communications to be cleared with their customers, the Material Safety Data Sheet. They had, according to the evidence, environmental scientists, industrial hygienists, toxicologists, medical doctors *as part of a committee*, along with a product steward, review these communications" and the president of Dow said "to this *group of executives* doing MSDS's: Do the right thing, *I'm giving you the power* to make these decisions." (Emphasis added.) The evidence, however, showed that the MSDS's were "routed" to technical experts and "others" before they were released. There is no evidence that there was a "committee," that the so-called committee was comprised of a "group of executives" or that the president told the persons working on the MSDS's that he was giving them "the power to make these decisions." There is also no evidence that Dow's process was the same or similar to Vulcan's, whereby a number of corporate officers signed off on the MSDS's before they were released.

In this same vein, it is worth noting that, on essentially the same evidence against Dow in Phase III (in which Vulcan was *not* a party) the jury, on a 10 to 2 vote, found no malice.

54

(or authorized, or ratified) by an "officer, director, or managing agent." (Civ. Code § 3294, subd. (b).) This was to "avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from corporate liability for punitive damages. [Citations.]" (*White, supra,* 21 Cal.4th at p. 572.)

As to the record, the City failed to substantiate its claim that the product stewards were managing agents. While the record amply supports the findings of corporate liability, it lacks clear and convincing evidentiary support for one of the elements necessary to support the imposition of punitive damages on Dow, and we must, accordingly, vacate that portion of the jury's verdict.

## D. Directed Verdict Based on "No Present Injury"

### 1. Procedural History

During the Phase III jury trial, defendants filed a motion for directed verdict, arguing (among other things) that the City's appropriative interest in its groundwater had not suffered a present injury, but only a possible future injury at 18 sites, and therefore could not be a basis for claiming damages at those sites under negligence and product liability theories. Defendants relied on *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 325 (*Santa Clara*) and *Aas v. Superior Court* (2000) 24 Cal.4th 627, 649 (*Aas*). To set the stage, we take a brief detour to summarize those cases.

In *Santa Clara*, the plaintiffs (a number of governmental entities) sued various manufacturers of paint that contained lead. Among other things, the plaintiffs sought damages for injuries to their buildings, under negligence and products liability theories, based on the presence of lead paint on the walls, which would have to be tested and removed. (*Santa Clara*, *supra*, 137 Cal.App.4th at p. 320.) Defendants successfully demurred to these causes of action. A majority of the court of appeal affirmed. It concluded that plaintiffs' damage claims "do not include any allegations of physical injury . . . and therefore their causes of action for negligence and strict products liability . . . *have never accrued.*" (*Id.* at p. 318.) The court followed the holding in

*Aas* that homeowners may not sue contractors and developers for the cost of repairing construction defects under a negligence theory if the defects have not caused property damage. (*Aas, supra,* 24 Cal.4th at p. 632.) The *Santa Clara* court reasoned: The plaintiffs did not allege that the presence of lead paint caused any damage to or deterioration of the walls or floors of the structure "other than the lead paint [itself]" (*Santa Clara*, at p. 325), and so the damages allegations could "only be characterized as seeking the cost of repairing [their] buildings" which is a purely economic loss (*id.* at p. 321); therefore, plaintiffs failed to allege the final element under the negligence or strict liability causes of action—physical injury. (*Id.* at p. 325.)[20]

Upon these authorities, defendants argued below that the City had not made a prima facie case for its negligence and strict liability claims because there was no evidence of physical damage to the City's property, i.e., the PCE contamination was not interfering with its sewers or easements nor with its appropriative right to acquire groundwater. With respect to the groundwater, defendants took the position that, because the State owns all water in trust for the people, and because state agencies, such as the Regional Water Quality Boards are charged with protecting water quality, regulating and avoiding the discharge of contaminants, and overseeing cleanup of contamination—and the City is not so charged—the City's property interest in the groundwater is limited to that which it actually or imminently pulls into its wells. Acknowledging that the City's right "may be interfered with in the future" defendants argued there had, as yet, been no "present injury" to the City's appropriative water rights because the PCE contamination

---

[20] The dissent in *Santa Clara* took the position that *Aas*, a construction defect case, was inapplicable; that "appreciable harm" can occur without actual physical or personal injury where "contamination" results from defendant's product, citing *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1333 (*SFUSD*); and that the *measure* of damage (economic losses due to costs of repair) should not be confused with the nature of the injury (physical harm from contamination), citing *Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 527 (*Transwestern*). (*Santa Clara, supra,* 137 Cal.App.4th at pp. 338-340.)

emanating from (most of) the Phase 3 sites was not a current threat to any of the City's wells.[21]

With respect to the soil contamination, defendants contended there had been no proof of any damage to the sewer system, or the wastewater system, and no incident where any special precautions needed to be taken by City workers due to PCE contamination.

In response, the City argued that it had a property interest in, and power over, not just in the water it actually uses, but all of the groundwater over which it holds appropriative rights. The City pointed to Water Code section 106.5—providing that a municipality's right to acquire and hold rights to the use of water "should be protected to the fullest extent necessary for existing and future uses"—and to cases holding that the *right* to the use of underground waters by the overlying appropriator is a protectable property interest. (*Fullerton v. State Water Resources Control Bd.*, (1979) 90 Cal.App.3d 590, 598-599; *Rank v. Krug* (S.D. Cal. 1950) 90 F.Supp. 773, 788.)[22] The City also pointed to Public Utilities Code section 10153 which provides that a city has the right to take "any waters belonging to the State."

---

[21] Defendants conceded there was evidence that contamination at some sites did threaten contamination at a City well, and as to those sites, the court denied the motion for directed verdict.

[22] Defendants also relied on *Fullerton* to support their argument that the City's appropriative *rights* are limited to the groundwater the City actually *appropriates* for delivery to its customers. Defendants pointed to *Fullerton*'s recitation of the general rule that an appropriation consists of "[t]he intent to take [water], accompanied by some open, physical demonstration of the intent, and for some valuable use," meaning that actual diversion or control over the water seeking to be appropriated is a necessary element to an appropriative right. (*Fullerton*, *supra*, 90 Cal.App.3d at pp.598-599, ["The significant common element of all of these forms of possession is some physical act with respect to the water by the appropriator to manifest the possessory right"].) While this is a correct statement of the law it is not applicable here. In *Fullerton*, the petitioner was seeking to establish a *new* "appropriative" right without proposing to divert or take control over the water. (*Id.* at p. 594.) Here, no one disputes that the City has long since established an appropriative *right* in the Modesto's groundwater by its diversion and control over that groundwater.

The City also argued that the introduction of contamination to the City's easements was itself considered "damage" under tort law, citing *Transwestern, supra,* 46 Cal.App.4th at p. 531. Finally, the City pointed out the trial court had already ruled, in an earlier motion, that (1) *Santa Clara* is distinguishable because it pertains to the presence of lead paint in buildings, not the presence of a chemical contaminant in soil and water, and (2) "[d]efendants [had not cited] any authority holding that water and/or soil contamination does not constitute 'physical damage' for purposes of . . . products liability law. . . ."

The court, it should be noted, had previously been asked to determine whether the City could even pursue tort claims for contamination of its groundwater if it had not yet entered any wells. The court ruled that the City "has the right to bring an action to remediate contamination of [the water in the aquifer] even though it has not yet entered the City's wells," and therefore, "[d]efendants' argument that the City cannot sue in products liability and negligence because the City's right to the aquifer water has not been perfected misses the point and is simply not persuasive." It further concluded—on the question of whether the City had suffered "appreciable harm" as a result of the release of PCE—"the City alleges that there is currently a PCE plume in the aquifer. [Citation to transcript.] If the jury agrees and finds that the plume 'caused [the City] to act, or reasonably should have caused it to act, in response to the contamination' [citing *In re Methyl Tertiary Butyl Ether Products Liability Litigation* (*MTBE*) (S.D.N.Y. 2006) 475 F.Supp.2d 286, 293], then the City has suffered 'appreciable harm' under the rule set forth in *MTBE*."

In spite of this earlier ruling, the court granted defendants' motion for directed verdict as to 14 of the 18 sites. The court again concluded that the City has a statutory right to acquire and use groundwater for municipal purposes and that this right includes the "duty to provide drinking water to City residents and to protect water destined for City wells from contaminating those wells." And the court again rejected the limitations of *Santa Clara*, stating that neither *Santa Clara* nor any other case prevents a municipality from suing in tort for "interference with or damage to its usufructuary rights

58

in groundwater . . . [including] under the strict products liability theory it advances[]" (again, citing *In re Methyl Tertiary Butyl Ether Products Liability Litigation* (S.D.N.Y. 2006) 457 F.Supp.2d 455, 461).

Observing that neither party had cited authority that defined what would constitute interference with or damage to appropriative rights (and apparently rejecting its previous reliance on the standard of "appreciable harm" set forth in *MTBE*), the court crafted its own definition. It concluded that, while the City would not be required to prove the PCE had actually reached its wells, "[a]t a minimum, there would have to be an *imminent* threat to a municipality's drinking water in order for a jury to conclude that the municipality's rights in that water have been damaged or interfered with." (Italics added.) The court therefore directed a verdict for defendants with respect to 14 of the 18 sites because the City's own evidence showed there was no threat to *municipal wells* as a result of the contamination at those sites. The court also concluded (contrary to its prior ruling that contamination constitutes "physical damage") there was no evidence from which a jury could conclude that there had been any actual interference with or damage to the City's easements, e.g., the City had not shown the contamination had caused any damage to the sewer or wastewater systems, or any City property.

### 2. Arguments on Appeal

Challenging this ruling on appeal the City argues, as an initial matter, that case law is more protective of appropriative rights than the trial court allowed, providing recourse to legal remedies if there is any "substantial infringement" of those rights, including the right to have the water preserved "in its natural state of purity, so far as may be necessary" for the appropriator's purposes, citing *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908, 926 and *Town of Antioch v. Williams Irrigation Dist.* (1922) 188 Cal. 451, 457-458. The City also relies on *Wright v. Best* (1942) 19 Cal.2d 368 (*Wright*), in which the court restated the "established rule" that "[a]ny material deterioration of the quality of the stream by subsequent appropriators *or others without superior rights* entitles [the earlier appropriator] to both injunctive and legal relief." (*Id.* at p. 378, italics added.)

The City more pointedly argues there is ample authority for its claim that the release of hazardous waste into the environment *itself* constitutes harm to property. For this proposition, the City cites *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 842 (*AIU*); *Aerojet-General Corp. v. Superior Court* (1989) 211 Cal.App.3d 216, 229 (*Aerojet*); and *Transwestern*, *supra*, 46 Cal.App.4th at p. 524.

In *Aerojet* and *AIU* the insureds were companies that became liable for costs incurred by, or required by, governmental agencies for remediation of polluted soil and groundwater. One question posed was whether these costs were covered by their general liability policies, pursuant to the "property damage" clause.[23] Among other arguments, the insurance companies asserted that agency-imposed liability for the cost of cleaning up pollution released into the environment is not "property damage." (*Aerojet, supra,* 211 Cal.App.3d at pp. 223-224, 227-230; *AIU, supra,* 51 Cal.3d at pp. 821, 830, 831, 834-835.) The courts rejected this claim. As the court in *Aerojet* explained: "The state's property interest in groundwater, . . . is no less usufructuary than that of private ownership, and public waters may be duly used, regulated and controlled in the public interest. [Citations.] …. [¶] Pollution of the ground and river waters is damage to public property, as well as a direct injury to public welfare. [Citations.] [T]he great weight of authority hold[s] environmental contamination to be 'property damage.' [Citation.]" (*Aerojet, supra,* 211 Cal.App.3d at pp. 229-230; *AIU, supra,* 51 Cal.3d at p. 842 [contamination of the environment is property damage].)

In *Transwestern*, a transporter of natural gas in pipelines sued Monsanto, the manufacturer of a product containing polychlorinated biphenyls (PCB's), for indemnity. Transwestern delivered natural gas to Southern California Gas (SoCalGas). Monsanto's product, used by Transwestern in its gas compressor, leaked into its pipes ultimately

---

[23] In *AIU* the contract provided coverage for " 'all sums which [the insured] shall be obligated to pay by reason of the liability…imposed upon [the insured] by law…for damages, . . . and expenses, . . . on account of . . . property damages. . . .' " (*AIU, supra,* 51 Cal.3d at pp. 814-815.) The *Aerojet* contract provided coverage for " 'all sums which the Insured shall become legally obligated to pay as damages because of injury to…property.' " (*Aerojet, supra,* 211 Cal.App.3d at p. 222 [emphasis removed].)

resulting in PCB pollution of SoCalGas's pipelines. Although PCB posed no danger from its mere presence in the pipes, it mixed with condensation naturally found in the pipes, which had to be removed from the pipes on a regular basis. Consequently, the gas company was required by federal regulations to take special precautions when removing and disposing of the condensate and to monitor PCB levels. (*Transwestern*, *supra*, 46 Cal.App.4th at p. 510.) Transwestern and SoCalGas reached a settlement as to how to share the additional costs of handling the polluted material and of monitoring the PCB's. Transwestern then successfully sued Monsanto for equitable indemnity for the past and future expenses related to the PCB pollution upon the theories of strict products liability and negligence (failure to warn). (*Id.* at p. 511.)

Monsanto argued on appeal that the costs of managing the pollution were economic losses, and not compensation for property damage. Monsanto contended that the presence of PCB's from its product in the pipes did not "cause damage to SoCalGas's property because "[t]he pipes still piped, the pumps still pumped and the meters still metered just as well as they had before. The only harm to SoCalGas was the increased cost of performing the routine business operation of collecting, storing and disposing of the pipeline condensate once it was discovered the condensate contained PCB's. In other words, the 'damage' to SoCalGas was to its profits, not its property." (*Transwestern*, *supra*, 46 Cal.App.4th at p. 524.) After reviewing cases from California and other state and federal courts (*id.* at pp. 527-530), the court rejected Monsanto's argument, concluding that the harm to SoCalGas "was clearly in the nature of property damage because the PCB's contaminated the SoCalGas pipelines and the condensate within the pipelines, both of which were the property of SoCalGas." (*Id.* at p. 530.) Monsanto, the court concluded, was confusing the measure of damages with the nature of the damage. In explanation, the court quoted from *Northridge Co. v. W.R. Grace and Co.* (Wis. 1991) 471 N.W.2d 179, 186, a Wisconsin Supreme Court case which affirmed that costs of removal and replacement of asbestos were recoverable under a negligence theory. " 'While economic loss is measured by repair costs, replacement costs, loss of profits or diminution of value, the measure of damages does not determine whether the complaint is

61

for physical harm or economic loss. . . . In other words, the fact that the measure of the plaintiff's damages is economic does not transform the nature of its injury into a solely economic loss. . . . Physical harm to property may be measured by the cost of repairing the buildings to make them safe.' [Citation]." (*Transwestern*, at p. 531.) SoCalGas attempted to remove the PCB's from the pipe walls, but could not, and so had to use special precautions in handling and disposing of the condensate. "[T]he costs of both activities are recoverable as property damage. . . ." (*Ibid.*; and see, *SFUSD*, *supra*, 37 Cal.App.4th at p. 1333 [costs incurred for remediation of contamination resulting from friable asbestos is actionable under negligence and strict liability theories].)

The *Transwestern* court also affirmed the award for future costs of remediation. Monsanto claimed they were speculative, but the court concluded that it was "reasonably certain" SoCalGas would incur those expenses in the foreseeable future, and the exact amount of those expenses need not be capable of precise measurement. "Courts in similar cases have routinely awarded damages for the projected costs of remedying pollution. [Citations.]." (*Transwestern*, *supra*, 46 Cal.App.4th at pp. 532-533.)

Based upon this triad of cases the City argues that contamination of the groundwater over which the City holds an appropriative property right, as well as contamination of its property (easements) is, itself, physical harm. Consequently, the City contends, the trial court incorrectly ruled that the contamination must pose a present threat to its municipal supply wells, or interfere with the use of its easements, in order to prove that it has been harmed.

In its responding brief defendants claim *only* that the City "erroneous[ly]" characterized the trial court's ruling. According to defendants, the City is incorrectly asserting that the court "limit[ed] the City to damage claims where PCE exceeded the MCL in City water wells . . . or would do so imminently," when in fact the court "broadly" allowed the City to claim damages "wherever *groundwater* to be used by City residents imminently threatened to exceed the MCL." This contention is at best confusing. In making that claim defendants do not cite to the trial court's ruling, but to isolated excerpts from the lengthy oral argument on the motion and to the *jury instruction*

62

used to define "[h]arm to City property." But, for the directed verdict motion, the court—at defendants' urging—used a different definition of harm to the City's property: it ruled that, for a jury to find the City's water rights had been damaged or interfered with, the City must show "[a]t a minimum, there would have to be an imminent threat to a municipality's drinking water" meaning, to *municipal supply wells*. Later in the brief, defendants more accurately (but inconsistently) state that the nonsuit was granted because contamination at the ten sites did not then threaten municipal supply wells.

With respect to contamination of the easements, defendants do not counter the City's legal argument that the soil contamination is itself property damage, but merely restate the trial court's finding that the City had not shown "harm from PCE to its sewers, streets, or soil."

### 3. Analysis

As a preliminary matter, we are troubled by what appears to be a procedural whipsaw. Prior to trial, the court squarely ruled that a City can prove "appreciable harm" if the City convinces a jury that there was PCE contamination in the aquifer that "caused [the City] to act, or reasonably should have caused it to act, in response to the contamination."[24] At trial, the City presented evidence that there is PCE exceeding the MCL in the soil at all of the sites and in groundwater at most of the sites, and the City's expert testified that these levels of contamination, pursuant to state standards, required remediation. Only after the evidence was closed, and defendants filed their motion for directed verdict, did the judge conclude that reasonable actions taken in response to contamination, alone, were not enough.

Further, on this record, it appears the trial court should not have taken the issue away from the jury because the agreed-upon jury instruction on "harm" was not the same

---

[24] In fact, the defendants sought to *exclude* evidence of any damages for "[p]otential [f]uture [c]ontamination of [w]ater [w]ells," and the City made clear it was seeking damages only for " 'the costs of remediating actual, appreciable, measurable quantities of PCE present in soil and groundwater on City property,' " and " '[n]o expert has proposed to testify regarding "fear of future wellhead treatment costs." ' "

63

as that applied by the court in directing a verdict.  The instruction read:  "Harm is present physical injury to City property.  The City does not own any groundwater.  Rather, in this case, the City has a property interest in groundwater that will be delivered to City residents.  This property interest is harmed when *the groundwater to be used by City residents exceeds or is imminently threatened to exceed* a PCE concentration of five parts per billion. . . ."  (Italics added.)  This is different from the court's directed verdict standard which required an imminent threat to the city's *drinking water*— specifically, to its *municipal supply wells*.  While the jury *might* have concluded that "groundwater to be used by City residents" actually meant only groundwater that was in, or imminently about to enter a well, such a conclusion was not compelled by the evidence nor by the wording of the instruction.

Neither of these issues, however, has been briefed so we will not consider them as grounds for reversal of the court's order.

As to the merits of the appeal, defendants have chosen not to meet the legal issue raised in the opening brief, viz., whether contamination of groundwater in which a city has appropriative rights, and contamination of a city's other property interests (i.e., its easements) itself constitutes harm, irrespective of whether the contamination constitutes an imminent threat to wells, and irrespective of whether the contamination has caused separate damage to the city's infrastructure or interfered with the use of its easements.[25] Defendants do not explain why the holdings in *Santa Clara* and *Aas*—which were rejected twice by the trial court as inapposite (even while *granting* defendants' motion)— should nevertheless apply here, rather than *AIU, Aerojet,* and *Transwestern,* cited by the City, which hold that contamination of soil and groundwater *is* property damage.  (See also, *SFUSD, supra,* 37 Cal.App.4th at p. 1335 [appreciable harm occurs when asbestos becomes friable and causes "contamination"].)  Instead, defendants simply repeat the trial

---

[25]  Defendants do point out that nonsuits were granted on other grounds with respect to some defendants as to five of the disputed sites, and the City concedes the point.

64

court's conclusion that the directed verdict was properly ordered because the evidence showed the contamination in and around the 14 sites did not threaten any wells. As we are "not required to examine undeveloped claims or to supply arguments for the litigants" (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52), we will treat the legal points as conceded, and vacate the order granting the directed verdict.[26]

## E. Statute of Limitations for Claims Regarding Elwood's Sites

### 1. Procedural Background

At the Phase 3 trial, the jury heard evidence about PCE contamination from many dry cleaning sites, including a group of three sites referred to as the Elwood's Group. Defendants contended the City's claims as to this group of sites was barred by the three-year statute of limitations for injury to real property. (Code Civ. Proc., § 338, subd. (b).) In the verdict forms, the jury was asked in question 1.1, "Have the defendants proved that the City's claimed harm in relation to the Elwood's Group occurred before December 3, 1995?" The jury unanimously answered, "Yes." The jury was then asked in question 1.2 whether the City knew, before December 3, 1995, of facts that would cause a reasonable person to know or suspect that someone's wrongful conduct caused harm to Modesto groundwater intended for use by Modesto residents, that the harm consisted of contamination of the groundwater with PCE concentrations "exceeding or imminently threatened to exceed 5 ppb," and that the harm actually existed before December 3, 1995. The jury was unable to reach a verdict as to this question. As to damages, the jury found the City's reasonable costs for investigating and developing an appropriate remedy were $320,000, and that its future remediation costs would be $18 million.

---

[26] With respect to contamination of the soil in the City's easements, defendants merely repeat the trial court's finding that the City failed to "present evidence of harm [other than contamination itself] from PCE to its sewers, streets, or soil." Having presented no contrary argument to plaintiffs' legal theory, we need not address this further.

Upon remand these issues may become moot if, as the City has hinted, it proceeds only on the reinstated nuisance and Polanco Act causes of action.

The City brought a motion for judgment notwithstanding the verdict (JNOV) as to question 1.1, contending defendants had failed to submit expert testimony to support their statute of limitations defense. The trial court denied the motion.[27] The City contends this ruling was erroneous.

" ' " 'The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found, to uphold the trial court's denial of the motion.' " [Citation.]' [Citation.]" (*Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 289.)

The jury was instructed on harm as follows: "Harm is present physical injury to City property. The City does not own any groundwater. Rather, in this case, the City has a property interest in groundwater that will be delivered to City residents. This property interest is harmed when the groundwater to be used by City residents exceeds or is imminently threatened to exceed a PCE concentration of five parts per billion, the legal maximum of water that can be distributed for human consumption." The evidence showed that one of the Elwood's sites is approximately 2,000 feet from the nearest well, Well 2.[28] The City contends that, as a matter of law, the jury could not find that it suffered harm before December 1995, as defined in the instruction, in the absence of expert testimony about the rate of migration of PCE through soil and into groundwater to help it determine whether PCE contamination had spread far enough by that date to

---

[27] The trial court also granted defendants' motion for judgment as to question 1.2, ruling that the City had failed to plead or prove facts showing how and when it discovered its claim with respect to the Elwood's sites. The City contends on appeal that this motion should have been denied as moot because the delayed discovery rule applies only if accrual would otherwise bar an action, but does not raise any substantive challenges to this ruling.

[28] The evidence often refers to only one of the three Elwood's sites. For purposes of the question before us, it is not necessary to identify which site is being referred to. However, it appears only two of the sites were being considered as sources of contamination.

threaten imminent exceedance of the MCL in Well 2.  The City does not dispute that the jury received expert evidence regarding PCE contamination at the Elwood's site and its effect on Well 2, but contends that evidence did not sufficiently address the effects of the contamination before December 1995.

### 2. *Evidence at Trial*

The trial exhibits include two reports regarding PCE contamination as a result of activities at the Elwood's site.  The first of them, entitled "City of Modesto Ground-Water Investigation," dated October 30, 1989, was prepared by Radian Corporation for the Toxic Substances Control Division of the State Department of Health Services (the Radian report).   This report indicated that PCE had been found in samples taken from Well 2 at concentrations of 0.98 and 1.0 parts per billion.  The Elwood's site had elevated soil vapors of 183 parts per billion of TCE and greater than 100 parts per million (100,000 parts per billion) of PCE.

The second report is the "Modesto Well Investigation Summary," dated January 7, 1992, prepared by the Central Valley Region of the California Regional Water Quality Control Board (the RWQCB report).  The purpose of the RWQCB's investigation was "to determine sources of tetrachloroethylene (PCE) contamination" in various Modesto wells, including Well 2.  The report noted that Elwood's had been in business since 1953, that it used PCE as a dry cleaning agent, and that wastewater containing PCE was discharged to the sewer.[29]  The Elwood's site was contaminated.

The RWQCB had conducted soil surveys around Well 2 in 1991, and found several "PCE plumes."  Plume 1, which originated near Elwood's, turned southwest toward Well 2.  A chart indicated the plume was approximately one mile in length.  The report explained that Plume 1 and Plume 2, "are really one plume (Plume 1-2) that starts in the general area between Deluxe Cleaners and Elwood's Dry Cleaning Service.  The

---

[29]  Another Elwood's site began operations in 1980.  According to an expert, multiple, large releases of PCE emanated from that location.  The contamination was calculated to have traveled 1,500 feet in 15 years, based on estimates of groundwater velocities.

results also corroborate previous findings by staff that PCE comes out of sewer lines, either in gaseous or aqueous phase or both, and contaminates ground water." Elwood's was identified as one of two sources of Plume 1-2, "which is the probable source of PCE contamination in Well 2." A map in the report graphically depicts the edge of a massive plume almost touching Well 2.

Anthony Brown, an expert for the City, testified at trial that the releases at the Elwood's site threatened Well 2, which was the closest well in a downgradient direction. The Elwood's site contained concentrations of PCE "orders of magnitude" higher than the threshold for requiring remediation. Brown explained that, "The higher the concentration of the contaminant, the larger the sources of contaminant which can impact the groundwater. Therefore, there is more pollution in the actual groundwater." A greater concentration of the contaminant leads to a longer plume of contamination, which is more likely to reach a drinking water well.

Brown's testimony was primarily based on conditions between 2000 and 2003, when he conducted an investigation on behalf of the City. However, when questioned about the Radian report, Brown confirmed that the soil gas concentration in 1989 was more than 14 times greater than it was in 2000 to 2003. The jury also heard other expert testimony that, generally, PCE vapors can sink into the water table and condense, contaminating groundwater.

### 3. Analysis

As we discussed in connection with the directed verdict motion, the City has taken the position that "appreciable harm" occurs not just when the PCE in a well has exceeded or is about to exceed the MCL, but when the contamination in the aquifer from which Modesto draws its water and in the soils in the City's easements is at such a high concentration as to require remediation in order to protect the drinking water supply and exposure to PCE in and around the easements. The City has nonetheless argued on appeal that defendants did not present sufficient evidence to prove that the *PCE in Well 2* would exceed or imminently exceed the MCL before December 1995. The City candidly acknowledged at oral argument that under its own definition of "appreciable harm" it

68

would be very difficult to avoid a statute of limitations defense at the Elwood's sites, but did not concede the point. We shall, accordingly, adjudicate the issue as it has been presented to us.

The City contends the evidence summarized above is insufficient to support the jury's finding that its harm in relation to the Elwood's sites occurred before December 3, 1995. Rather, the City argues, it was incumbent upon defendants to provide expert testimony on the migration of PCE through soil and into groundwater, and the rate and timing of contamination necessary to become an imminent threat to Well 2. We reject this contention. As we have already described, the jury was instructed that the City's property interest was harmed when "the groundwater to be used by City residents exceeds or is imminently threatened to exceed a PCE concentration of five parts per billion," and the City does not challenge this instruction. There was evidence, both in the form of the Radian report and Brown's expert testimony, that PCE levels in the soil at the Elwood's site in 1989 were extremely high. As of 1991, a long plume of PCE contamination in the soil had formed, moving to the area around Well 2. Expert testimony explained how PCE traveled through soil and into groundwater, and in fact, by 1989 PCE was present, albeit below the MCL, in samples of water in Well 2. This evidence is sufficient to support the jury's finding.

The case of *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, cited by the City, does not require a different result. In *Bowman*, neighbors asserted an environmental impact report (EIR) should have been prepared for a proposed project in their neighborhood. One argument was that an adjacent parcel had been contaminated by leaking underground storage tanks, and examination of the impacts of hazardous material on the project was required. (*Id.* at p. 582) The record, however, contained reports showing that the site had been remediated and that monitoring over a seven-year period indicated the remaining contamination was confined to the site. (*Id.* at p. 581.) The neighbors interpreted the reports differently and opined it was reasonable to assume the contamination might have spread to the project site. (*Id.* at p. 582.) This court concluded that the neighbors' interpretation of the reports did not constitute substantial evidence to

69

support a fair argument that an EIR was required, because "a complex scientific issue such as the migration of chemicals through land calls for expert evaluation" and the neighbors had no such expertise. (*Id.,* at p. 583; see also *McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 100 [lay opinion on subject of migration of hydrocarbons through soil and interpretation of soil borings properly excluded].)

Here, in contrast, we are not examining whether the lay opinions of individuals should be given credence, or whether a lay witness can opine on scientific matters. Instead, we are reviewing the fact-finding of a jury which heard weeks of testimony, including expert evidence and reports describing the nature and extent of the soil contamination, how contamination moves through the subsurface, into the groundwater, and eventually to City wells, and the speed at which the contaminants can move with the groundwater. If, as a matter of law, more specific expert testimony was required in order for the jury to answer the question submitted to it by the parties—whether PCE contamination of the "groundwater to be used by City residents" was exceeding or on the verge of exceeding legal limits before December of 1995—the City was free either to supply that expert testimony or to seek a directed verdict based on insufficiency of the evidence. It did neither, and we are not permitted to overturn a jury's verdict if there is any substantial evidence to support it. (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 589.) Consequently, in the absence of legal error the verdict must be affirmed.

### F. Equitable Remedies at Phase II Sites

In its 2007 statement of decision at the conclusion of the Phase II trial, the court ruled that the RDA had proven its Polanco Act claim against defendants at the Modesto Steam site. As part of its statement of decision, the court directed that, when judgment was entered it would include an order enjoining Modesto Steam, Dow, Street and others to "comply with all future PCE remediation orders of the DTSC and the Regional Water Quality Control Board at the Modesto Steam site, subject to the right to challenge such orders in this Court, under such procedures as may be set forth in the injunction." The court explained: "Injunctive relief compelling defendants to remove or remediate

70

contamination is appropriate under [Civil Code section 3422], particularly given the fact that future costs would be extremely difficult to ascertain at sites where regulatory agencies are acting but have not yet approved a final plan." Moreover, according to the court, "In the absence of injunctive relief, Modesto Steam is free to abandon voluntary efforts and force new litigation in order to obtain a remedy," and "[t]he manufacturer defendants have consistently denied any responsibility for contamination at the Modesto Steam site, and injunctive relief is therefore both necessary and warranted with respect to these defendants."

The court also found the City had proven its HSAA claims against Halford's, and ruled that, "at the appropriate time" the court will enter a declaratory judgment that Halford's will be liable to the City for its future remediation costs, if any, at that site, and will "enjoin [Halford's] to comply with all future PCE remediation orders issued by [state agencies] . . . subject to [its] right to challenge such orders in this Court. . . ."

In 2011, in Phase V of this case, the trial court heard evidence as to whether equitable relief with respect to the Modesto Steam and Halford's sites was still necessary. The court issued its statement of decision on November 14, 2011. It noted that in the years since the Phase 2 decision, Modesto Steam had made significant remediation efforts under the oversight of the Regional Board, and that the EPA was acting as the primary remediating party at the Halford's site, a federal Superfund site. Thus, the court concluded, the issue before it was whether there was a present need for equitable relief under Civil Code section 3422.[30]

The dispute as to the continuing necessity of injunctive relief as to the Halford's site centered on the City's future liability for potential contamination of the City's

---

[30] Civil Code section 3422 authorizes injunctive relief "to prevent the breach of an obligation existing in favor of the applicant: [¶] 1. Where pecuniary compensation would not afford adequate relief; [¶] 2. Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; [¶] 3. Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or, [¶] 4. Where the obligation arises from a trust."

Municipal Well number 7 (Well 7), and its future liability in general. As to Well 7, the court concluded, "equitable relief is appropriate only if plaintiffs demonstrate it is presently warranted by establishing all three of the following facts: 1) Well 7 will likely be contaminated by the Halford's plume; 2) the EPA will not remediate this contamination; and 3) settlement credits attributable to the Halford's site are insufficient to cover future response costs." The court reviewed the evidence and concluded Well 7 was not likely to be threatened by the Halford's plume.[31] The court also noted that "[e]ven if plaintiffs establish Well 7 will likely be contaminated by the Halford's plume, equitable relief is only warranted if the EPA's ongoing remediation efforts will not already address such contamination," and pointed to the evidence that the EPA was likely to "finish the job."

Finally, the court stated, even if Well 7 was contaminated by the Halford's plume and the EPA failed or refused to remediate Well 7, the available settlement credits of $3.36 million attributable to the Halford's site would be sufficient to cover those costs. The trial court also found the City had not shown it was likely to face responsibility for remediation costs at the Halford's site in general through future litigation. The court concluded: "[P]laintiffs have not indicated whether any amount of pecuniary compensation would be necessary to afford adequate relief, whether such compensation would be difficult to ascertain, or whether the absence of equitable relief would lead to a multiplicity of judicial proceedings, thereby failing to establish any of the Section 3422 factors. In contrast, defendants have established the improbability that Well 7 will be contaminated or that plaintiffs would face future litigation. Defendants have also established the probability that the EPA will complete remediation of the Halford's plume, thereby demonstrating how the status quo substantially achieves the Phase 2 Decision's goal to shield plaintiffs from future response costs at the Halford's site. Accordingly, the Court declines to grant any equitable relief at the Halford's site."

---

[31] The court found plaintiffs' witnesses on this issue unpersuasive.

The court next considered the necessity of injunctive relief regarding the MSL site, which had contaminated the City's Municipal Well number 3 (Well 3). The court noted that plaintiffs had received an award of $1,079,000 in Phase 1 for the past and future costs of treating Well 3, and $349,808.05 in Phase 2 for past response costs, and that these awards were "within the ballpark of the City's actual costs." Moreover, MSL had been carrying out soil remediation under the Regional Board's oversight, and this remediation was "virtually complete." The evidence showed that filtering Well 3 could remediate the groundwater plume, and plaintiffs had "an award for future costs for Well 3 as well as millions of dollars in settlements attributable to this site." Accordingly, the court concluded, equitable relief as to the MSL site was unnecessary.

Our review of the court's ruling is highly deferential. "The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.) "[A] change in circumstances which renders injunctive relief unnecessary justifies denial of the remedy. [Citation.]" (*East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1126.)

The City does not challenge the standard of review, but argues only that "a discretionary ruling, 'reasonable' on its own terms, is subject to reversal 'when it starts from a mistaken premise….' [Citation]." The problem with the City's argument is that it has not identified a legally sound "mistaken premise."

Against the trial court's detailed findings, the City makes a single, cursory argument: that "[t]he trial court's test for equitable relief was whether Modesto faced a *sufficient* risk of future clean-up costs to warrant equitable protection from that risk," and that it is "unconscionable" to deny equitable relief if there is any such risk. The City cites no authority for the proposition that the trial court must grant injunctive relief if there is any risk, however slight, that it will be subject to cleanup costs in the future, and we may accordingly treat the issue as forfeited. (See *Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 947 [conclusory assertion unsupported by authority treated as forfeited].)

73

In any case, we are not persuaded. The court explained in detail that the Halford's site was unlikely to contaminate Well 7, that the EPA could be expected to complete the remediation it had begun, and plaintiffs had not shown the settlement money attributable to the Halford's site would be insufficient in the event Well 7 was contaminated and the EPA did not remediate it. It also explained that the soil remediation at the MSL site was nearly complete, that the City had been awarded money to cover the costs of remediating the groundwater plume by filtering Well 3, and that "millions of dollars" in settlement funds were also available.[32] The City does not challenge these factual findings, and it has not shown that the trial court abused its discretion in concluding that, in light of these facts, there was no present need for injunctive relief.

## G. Allocation of Settlement Credits

The City asserts as error the trial court's decision to grant to defendants credit for 100 percent of the settlement funds for all contaminated sites against defendants' liability at only three sites. The City argues that the majority of the settlement funds were allocated to specific sites, and should be applied exclusively to those locations. [33]

Because we have reversed some of the Phase III and all of the Phase IV rulings, the matter of credits, like the issue of costs, must necessarily be vacated as well. The issue, however, is likely to arise again after further proceedings, so we address it here for the guidance of the trial court.

---

[32] The parties dispute how settlement credits should be allocated (see § IV.G, post) and in our view it is unlikely that "millions" of dollars would be available to the City from the settlement funds allocated to the MSL site. It was the City's position below that there was $2.277 million in settlement funds allocable to MSL, against which defendants would be entitled to credits for the damages awarded against them. The City, however, makes no argument with respect to this issue nor does it contend that the settlement funds will not cover the potential future costs at Well 3.

[33] Although the focus of the City's argument in its opening brief was that the citywide *injunction* it requested should reflect the proper allocation of settlement credits, the City also asked us to correct the trial court's ruling on settlement credits "no matter how else [we] decide[] this appeal." Although we will not order the injunctive relief the City seeks, we conclude this issue is properly before us, and we will address it for the guidance of the trial court on remand.

74

## 1. *Procedural Background*

As has been described in various parts of this opinion, the City sued defendants for the contamination they allegedly caused at numerous dry cleaner sites throughout Modesto. Defendants Dow, PPG and Street were sued for damages at all of the sites. The extensive record reflects, and the parties do not dispute, that the case was litigated on a site-by-site basis. So, for example, in Phase I the parties litigated most of the claims relating to only six sites, and the jury verdict was rendered on a site-by-site basis. The alleged damages at approximately 40 other sites were litigated in Phase III. In that phase, various nonsuit and directed verdict rulings as well as jury findings were all made on a site-by-site basis. It will be recalled that the appealing defendants were found liable for damages at only four sites, MSL, Halford's, Ideal and Coffee Plaza.

During the course of the litigation, the City entered into settlement agreements with many of the defendants. Most of those settlement proceeds were expressly allocated to particular sites, but some were not. We shall assume—as it has been neither argued nor contested—that the settlements that were allocated received the court's imprimatur as having been made in good faith, pursuant to the provisions of Code of Civil Procedure section 877 et seq. As to the settlements that were not allocated, it appears the issue of allocation had not been raised at the time these were presented to the court for good faith approval.

One of the issues the trial court faced in the Phase V trial was what portion of the settlement proceeds were available to the non-settling defendants as credits. Plaintiffs took the position that "settlements . . . allocated to specific sites should be honored[, and w]here settlements were not specifically allocated . . . the Court should apply the same formula used by the settling parties . . . [which] formula was approved by the Court when it entered good faith orders approving settlements with allocations." Defendants argued that, because they were " 'potentially liable for the same injury to the plaintiff[s]' " as were the settling defendants, no allocation was needed, quoting *Alcal Roofing & Insulation v. Superior Court* (1992) 8 Cal.App.4th 1121, 1124 (*Alcal*). Defendants also contended that *all* settlement proceeds could be reallocated from the sites where

75

defendants were exonerated from liability to the sites where they were found liable, citing *El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1350-1351 (*El Escorial*).

The trial court agreed with defendants. It reasoned that under Code of Civil Procedure section 877, offsets "are ultimately claimed by *parties* and not by *sites*," and concluded, "defendants were manufacturers or distributors of products throughout Modesto who were potentially liable for the torts of all settling parties.[] Thus, defendants…may claim an offset of all settlements up to a total of $37,225,000.00, which reflects the sum of settlements by sixteen defendants, . . ."

### 2. *Legal Principles*

Code of Civil Procedure sections 877 and 877.6 established two competing policies: (1) the equitable sharing of costs among the parties at fault and (2) the encouragement of settlements. [34] (*Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1487 (*Erreca's*).) " 'Section 877 establishes that a good faith settlement bars other

---

[34] Code of Civil Procedure section 877 provides, in pertinent part: "Where a release…is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is greater. [¶] (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties. . . ."

As relevant here, Code of Civil Procedure section 877.6 provides: "(a) Any party to an action in which it is alleged that two or more parties are joint tortfeasors or co-obligors on a contract debt shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors or co-obligors…." [¶] (2) In the alternative, a settling party may give notice of settlement to all parties and to the court, together with an application for determination of good faith settlement and a proposed order. The application shall indicate the settling parties, and the basis, terms, and amount of the settlement. …. If none of the nonsettling parties files a motion [within a specified period] the court may approve the settlement. …. [¶] …. [¶] (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the

defendants from seeking contribution from the settling defendant [citation], but at the same time provides that the plaintiff's claims against the other defendants are to be reduced by "the amount of consideration paid for" the settlement [citation]. Thus, while a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant, the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff.' [Citation.]" (*Id.* at pp. 1487-1488.)

In a typical one-plaintiff, multiple-defendants personal injury action, all tortfeasors are potentially liable for the same injury to the plaintiff, and so the entire amount of any settlement by one of the defendants will offset a judgment against the other tortfeasors. But in other cases, the amount of the offset is uncertain, for example, where there are "multiple plaintiffs or causes of action with different damages," or where defendants have "settl[ed] claims for separate injuries not all of which would be attributable to conduct of the remaining defendants." (*Alcal*, *supra*, 8 Cal.App.4th at p. 1124; see also, *L. C. Rudd & Son, Inc. v. Superior Court* (1997) 52 Cal.App.4th 742, 750 (*L. C. Rudd*) ["Where there are multiple defendants, each having potential liability for different areas of damage, an allocation of the settlement amount must be made"].) Such issues often arise in construction defect cases where there are different categories or sites of damage for which different sets of defendants may be either singly or jointly liable. (*See, e.g., Regan Roofing Co. v. Superior Court* (1994) 21 Cal.App.4th 1685, 1705, fn. 8 (*Regan Roofing*) [explanation of a pro rata formula used to allocate settlement proceeds among the various categories of defects in 24 separate homes].) Such allocations are arrived at under a set of principles enunciated in *Alcal* and its progeny.

In *Alcal*, a construction defect case, the developer settled with the plaintiff homeowners association for $4.4 million, and settled with most of the subcontractors, who agreed to contribute almost $1.3 million toward the total. The developer sought, and obtained, approval of the settlement agreement's allocation of only $100,000 to roofing

settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."

issues, and the sole nonsettling defendant, a roofer, challenged the allocation. (*Alcal*, *supra*, 8 Cal.App.4th at p. 1123.) The appellate court first explained that, "[i]n a situation where the cash amount of the settlement does not dictate the amount of the offset, the settling parties must include an allocation or a valuation in their agreement." (*Id.* at pp. 1124-1125.) *Alcal* then laid down the rule that "a party seeking confirmation of a settlement must explain to the court and to all other parties not only who has settled with whom and for what dollar amount, but whether any settlement is allocated and how the allocation has been made between issues and/or parties." (*Erreca's, supra,* 19 Cal.App.4th at p. 1488.) To this rule *Erreca's* added the requirement that the party must also explain to the court and all other parties "the evidentiary basis for any allocations . . . and must demonstrate that the allocation was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached. [Citation]" (*Id.* at pp. 1495-1496.)

The allocations calculated at the time of the good faith settlement proceedings, although presumptively reasonable, may be reallocated when credits are determined after trial. (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1351 [trial court may adjust offsets in response to evidence adduced at trial].) In considering those credits, however, the court "must take into account not only the policy issues of the good faith settlement approval process (i.e., equitable apportionment of liability and promotion of settlements [citation]), but also another policy interest, 'the maximization of recovery to the plaintiff for the amount of . . . injury to the extent that negligence or fault of others has contributed to it.' [Citation.] Thus, while the nonsettling defendant is entitled to a fair setoff, the injured plaintiff also has a right that the setoff not be excessive." (*Erreca's*, *supra*, 19 Cal.App.4th at p. 1500.)

### 3. Analysis

The trial court relied on the principles that (a) offsets under Code of Civil Procedure section 877 are claimed by parties, rather than sites, and (b) joint tortfeasors may appropriately claim offsets. From this, the court concluded defendants were entitled to claim credits against all settlements for all the sites. We disagree with this approach,

78

first, because it ignores the fact that the site allocations were made during the good faith settlement process, and are therefore presumptively reasonable. The nonsettling defendants have thus been protected by the requirement that any settlement must have been made in good faith as the product of adversarial negotiation, and that the allocation itself also must have been made in good faith. (*Dillingham Construction, N.A., Inc. v. Nadel Partnership, Inc.* (1998) 64 Cal.App.4th 264, 279-281.) In addition, while a trial court has the latitude to make reallocations based on evidence adduced at trial, we do not think it has the discretion to eliminate or disregard wholesale *all* allocations on the sole basis that the defendants were *potentially* (but not actually) liable at all sites. *El Escorial* does not compel a different result.

In that construction defect case, the court approved a number of good faith settlements entered into by the primary contractor, Investec, and other contractors and subcontractors but no allocations were made at the time of the settlements. Instead, the parties agreed to a procedure by which the court, over the course of the trial, would hold hearings on apportionment, after which it would make decisions on the allocations. (*El Escorial*, *supra*, 154 Cal.App.4th at p. 1345.) The court thereafter, in a series of hearings, approved allocations of the settlement amounts, including an allocation for toxic mold. (*Id.* at pp. 1350-1351.) But after trial, the court found that plaintiff had failed to prove its claim that defendants were responsible for toxic mold contamination; it therefore removed toxic mold as a category of damages and reallocated the amount previously allocated to toxic mold to four other settlement categories. (*Id.* at p. 1347.) The plaintiffs challenged that ruling, claiming that allocations could not be modified once they were approved. (*Id.* at p. 1351.) The appellate court rejected that argument, reasoning that, since the plaintiff had "received a settlement on a claim for which there was no liability," it was entirely appropriate for the court to adjust the credits. (*Id.* at p. 1352.)

In this case, the court *did not* find that the City had "received a settlement on a claim for which there was no liability" nor did it remove any category of damages or sites. Rather, the court simply concluded that the nonsettling defendants would receive

79

credit for the allocations for all other sites because *they* were found not liable for those sites. This result is not supported by *El Escorial* nor by the realities of settlement allocations in this case. Defendants do not claim that the other sites were not damaged by the wrongful acts of the settling defendants, so there is no justification for, in effect, reallocating those settlement proceeds to the three sites where defendants were held liable. This would be contrary to the policy of " 'the maximization of recovery to the plaintiff for the amount of…injury to the extent that negligence or fault of others has contributed to it.' " (*Erreca's*, *supra*, 19 Cal.App.4th at p. 1500.) It would also run contrary to the policy of encouraging settlements. (*Id.* at p. 1495.) As plaintiffs persuasively argue, without reliable allocations it would be "too risky for many plaintiffs to settle."

The trial court's reasoning was faulty for other reasons as well. Contrary to the court's theory, nothing in the law prevents the parties to an action from giving credits for settlement proceeds by *sites* (as well as by parties) where the evidentiary record identifies damages by site. (See, e.g., *Regan Roofing*, *supra*, 21 Cal.App.4th at p. 1704.) In addition, to the extent the allocated settlement funds were paid by parties who did not face liability for the total amount of damages, but only for the sites to which the funds were allocated, those defendants were *not* jointly liable with defendants as to the other sites at issue.

Defendants point out that in both *L. C. Rudd* and *Regan Roofing*, the settling defendant was a development company, which was potentially liable for all damages, and it was the subcontractors—who faced liability for only a portion of the damages—who challenged the allocations. (*L. C. Rudd*, *supra*, 52 Cal.App.4th at p. 750; *Regan Roofing*, *supra*, 21 Cal.App.4th at pp. 1693-1694.) Because the case before us raises a different factual scenario—in which the *nonsettling* parties were potentially liable for all the damages—defendants contend there should be a different result. They argue that, because they faced potential liability for all damages claimed by the City, the settlement amounts allocated to specific sites should be credited to their actual liability without limitation. We have not found any cases raising this fact pattern, and the parties have

80

drawn our attention to none. Nor have defendants offered any support in either law or policy for their theory, which runs counter to the articulated policies supporting good faith settlements.

We thus conclude that, in the absence of some legally justifiable basis for reallocation, defendants are not entitled to credit at the sites for which they were found liable unless a good faith settlement agreement allocated funds to that site.[35]

As to unallocated settlement sums, because neither party has addressed this issue in the briefs on appeal, we shall leave to the trial court the proper treatment of this question as it reconsiders the credit issue in its entirety, after all other issues on remand have been adjudicated.

### H. Challenges to Cost Awards

#### 1. Background

The trial court initially entered judgment on November 15, 2011. The judgment included separate prevailing party determinations for Phases I through IV, including the following: (1) Plaintiffs City and the RDA were prevailing parties in Phases I and II, entitled to recover costs of suit on the complaints from defendants MSL, Halford's, Dow, Street, and PPG. (2) Defendants MSL, Halford's, Dow, Street, and PPG were prevailing parties in Phases III and IV, entitled to recover costs on the complaints from plaintiffs City and the RDA. (3) Cross-defendants City, the RDA, and the Sewer District were prevailing parties in Phases I and II, entitled to recover their costs on the cross-complaints from cross-plaintiffs MSL, Halford's, Dow, Street, and PPG. (4) The RDA was entitled to recover attorneys' fees as costs of suit under the Polanco Act, which were not eligible for settlement offsets, from MSL, Halford's, Dow, Street, and PPG.

Defendants moved to set aside and vacate the judgment (Code Civ. Proc., § 663, subd. (1)) and to correct clerical mistakes in the judgment (Code Civ. Proc., § 473, subd.

---

[35] The trial court's ruling also considered settlement credits for three other nonsettling defendants; two of those, MSL and Halford's, were each liable as to only one site. Those defendants are parties to this appeal for only a limited purpose, and their allocations are not challenged.

81

(d)) on November 30, 2011.  In the motion to vacate, defendants argued that all defendants were prevailing parties as against the RDA and the Sewer District in all respects, and that MSL, Halford's, and PPG were prevailing parties as against the City in all respects.

The City filed a notice of appeal of the judgment on January 4, 2012.[36] Defendants' motion was argued the following day, January 5, 2012.  The trial court entered an amended judgment on May 23, 2012.  The amended judgment altered the prevailing party determinations in the numerous respects.

### 2. *Jurisdiction*

The first question we face is whether the January 4, 2012 appeal effected an automatic stay of the trial court proceedings, such that the trial court lacked jurisdiction to rule on defendants' motion to vacate or set aside the judgment.  An appeal "stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, . . . but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).)  The purpose of this automatic stay " 'is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided.  The [automatic stay] prevents the trial court from rendering an appeal futile by altering the appealed judgment or order by conducting other proceedings that may affect it.' [Citation.]" (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189 (*Varian*).)  For this reason, "section 916, subdivision (a) stays all further trial court proceedings 'upon the matters embraced' in or 'affected' by the appeal.  In determining whether a proceeding is embraced in or affected by the appeal, we must consider the appeal and its possible outcomes in relation to the proceeding and its possible results. '[W]hether a matter is "embraced" in or "affected" by a judgment [or order] within the meaning of [section 916] depends on whether postjudgment [or postorder] proceedings

---

[36] As cross-defendant, the City filed a notice of appeal on January 17, 2012.

on the matter would have any effect on the "effectiveness" of the appeal.' [Citation.] 'If so, the proceedings are stayed; if not, the proceedings are permitted.' [Citation.]" (*Ibid*.) However, "[t]he fact that the postjudgment or postorder proceeding may render the appeal moot is not, by itself, enough to establish that the proceeding affects the effectiveness of the appeal and should be stayed under section 916. *Rather, something more is needed. For example, the trial court proceeding must directly or indirectly seek to 'enforce, vacate or modify [the] appealed judgment or order.'* [Citation.]" (*Varian*, *supra*, 35 Cal.4th at p. 189, italics added.) For this last example, our high court quoted *Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629, which stated, "The trial court's power to enforce, vacate or modify an appealed judgment or order is suspended while the appeal is pending." (*Varian*, 35 Cal.4th at pp. 189-190; see also *Betz v. Pankow* (1993) 16 Cal.App.4th 931, 938 [because vacation of judgment would affect its enforcement, "it could not be considered a collateral matter over which the trial court could retain jurisdiction"].)

Consistent with this rule, the court in *Copley v. Copley* (1981) 126 Cal.App.3d 248 (*Copley*) concluded that a trial court may not rule on a motion to vacate a judgment while an appeal is pending. There, judgment was entered in a trust litigation, and the trustees filed a timely notice of appeal. Two other parties thereafter filed a motion to vacate the judgment pursuant to Code of Civil Procedure sections 473 and 663. The appellate court concluded, "At this time the court lacked jurisdiction to hear the matter because the perfecting of an appeal stays proceedings in the trial court upon the judgment appealed from [citation]. During the pendency of an appeal, the trial court is without power to hear a motion to vacate judgment from which an appeal has been taken [citations]." (*Copley*, *supra*, at p. 298.) Relying on *Copley*, the court in *Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1317 (*Ehret*), explained, "When an appeal was filed, the effect was to ' "remove[] from the jurisdiction of the superior court the subject matter of the judgment. [Citations.]" ' [Citations.] 'During the pendency of an appeal, the trial court is without power to hear a motion to vacate judgment from which an appeal has been taken [citations].' (*Copley*[, *supra*, 126 Cal.App.3d at p. 298].) The point of the rule is to

preserve the status quo while the appeal is decided. [Citation.]" (See also *Lippman v. City of Los Angeles* (1991) 234 Cal.App.3d 1630, 1634 (*Lippman*) ["This avenue . . . was not open to [the parties] because the same day they filed their motion to vacate the judgment, PAC filed its notice of appeal thereby depriving the court of jurisdiction to vacate its judgment"]; *Socol v. King* (1949) 34 Cal.2d 292, 295 [recognizing that by filing notice of appeal, appellant deprived trial court of jurisdiction to act on statutory motion to vacate].)

Defendants attempt to distinguish *Copley* and *Ehret* on the ground that they involved "long delays before a trial court declined amendment." This distinction is unavailing. The rule of those cases was not based on the length of delay, but on the trial court's loss of jurisdiction once a notice of appeal had been filed.

Defendants also point out that the Legislature created three post-judgment motions—the motions for judgment notwithstanding the verdict (Code Civ. Proc., § 629), for a new trial (*id*., § 657), and to set aside and vacate the judgment (*id*., § 663). They note that new trial motions are treated as collateral to the judgment and are allowed to proceed despite an appeal from the judgment, and argue that statutory motions to vacate the judgment should be treated the same way. (See *Varian*, *supra*, 35 Cal.4th at p. 191 ["[A] motion for a new trial is collateral to the judgment and may proceed despite an appeal from the judgment"]; accord *Neff v. Ernst* (1957) 48 Cal.2d 628, 634 ["A motion for new trial is recognized to be a matter collateral to the judgment and the trial court retains jurisdiction to hear and determine a motion for new trial after an appeal has been taken from the judgment"].) Similarly, it was held in *Foggy v. Ralph F. Clark & Associates, Inc.* (1987) 192 Cal.App.3d 1204, 1210-1213, that a trial court had jurisdiction to enter a JNOV while an appeal was pending. The court noted that a new trial motion was considered collateral to the judgment, and reasoned, "We are at a loss to understand how a motion for judgment notwithstanding the verdict can be considered as concerned with 'matters embraced' in or 'affected' by the judgment appealed from, while a motion for new trial is not. It is for this reason that we hold a motion for judgment notwithstanding the verdict is, just as a motion for new trial, a matter collateral to the

84

judgment. This ruling, just as the Legislature intended, enables the trial court to consider both a motion for judgment notwithstanding the verdict and a motion for new trial at the same time and avoids what would otherwise be the absurd result of depriving a party of a postjudgment remedy authorized by the Legislature." (*Id.* at p. 1213.)

Defendants argue this analysis should apply with equal force to a statutory motion to set aside or vacate a judgment. Whether or not that is so, we are constrained by the rule enunciated by our high court in *Varian*, as well as by lower courts in *Copley* and *Ehret*, that a trial court loses jurisdiction to vacate or amend a judgment upon the perfecting of an appeal. (*Varian*, *supra*, 35 Cal.4th at pp. 189-190; *Copley*, *supra*, 126 Cal.App.3d at p. 298; *Ehret*, *supra*, 73 Cal.App.4th at p. 1317.) Indeed, the court in *Lippman* observed, "unlike the motion to vacate [the judgment], the trial court does not lose jurisdiction to grant a motion for new trial when a notice of appeal is filed." (*Lippman*, *supra*, 234 Cal.App.3d at p. 1634.)[37] We are also constrained by the language of Code of Civil Procedure section 916, subdivision (a), which provides that an appeal stays trial court proceedings "upon the judgment or order appealed from or upon the matters embraced therein or affected thereby." A motion to vacate or set aside a judgment seeks to have a court set aside a judgment and have a different judgment entered. (Code Civ. Proc., § 663.) On its face, such a motion is a proceeding upon the judgment, or upon "matters embraced" or "affected" by the judgment. (*Lippman*, *supra*, at p. 1634.)

In light of this consistent authority, we conclude the trial court lacked jurisdiction to rule on defendants' motion to vacate or set aside the judgment. The operative judgment is the original judgment dated November 15, 2011.

### 3. *Prevailing Parties in Phases I and II*

---

[37] *Lippman* explained that the reason for the distinction was that a motion for a new trial was a collateral matter, but a motion to vacate the judgment concerned "matters embraced" or "affected" by the judgment. (*Lippman*, *supra*, 234 Cal.App.3d at p. 1634, fn. 3, citing *Weisenburg v. Molina* (1976) 58 Cal.App.3d 478, 486.) The court went on: "While the logic of this rationale is questionable [citation], we are bound by its result. [Citation.]" (*Ibid.*)

In their cross-appeal, defendants argue that if we conclude—as we do—that the trial court lacked jurisdiction to enter the amended judgment, the original judgment's prevailing party determinations should be reversed in significant part. In particular, defendants challenge the original judgment's conclusions that the RDA was a prevailing party entitled to costs in Phases I and II. They point out that the damage awards were fully offset by settlement credits and that the judgment did not award any equitable or other relief to RDA. Because RDA failed to obtain relief, they argue, defendants are the prevailing parties as a matter of law.

Code of Civil Procedure section 1032, subdivision (a)(4) defines a prevailing party to include "[1] the party with a net monetary recovery, [2] a defendant in whose favor a dismissal is entered, [3] a defendant where neither plaintiff nor defendant obtains any relief, and [4] a defendant as against those plaintiffs who did not recover any relief against that defendant. If any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . ." Thus, a party who fits into one of the four specified categories is entitled to recover costs as a matter of right. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1333, 1338, fn. 4 (*Goodman*); accord *Charton v. Harkey* (2016) 247 Cal.App.4th 730, 738.) Otherwise, the trial court has discretion to determine the prevailing party. (*Goodman*, 47 Cal.4th at p. 1338, fn. 4.) "Whether a party falls within one of the four categories authorizing the recovery of costs as a matter of right is a question of law we review de novo. [Citations.] We otherwise review a trial court's cost award for abuse of discretion. [Citations.]" (*Charton*, *supra*, 247 Cal.App.4th at p. 739.)

As we have already explained, in 2007, after the Phase II trial, the trial court ruled that, when it rendered final judgment, it would enjoin (among others) MSL, Dow, Street, and PPG to comply with remediation orders and would enter an order declaring that defendants will be liable for any future remediation costs incurred by the RDA. However, in 2011, after Phase V, the court concluded injunctive relief was no longer necessary. Thus, the judgment did not order equitable or injunctive relief. After

86

applying offsets for settlement credits, the November 2011 judgment did not award economic damages to plaintiffs.

The trial court found, in the operative judgment, that the City and the RDA were prevailing parties in Phases I and II, entitled to recover costs from MSL, Halford's, Dow, Street, and PPG. As to Phase II, the court noted that the 2007 statement of decision awarded equitable relief to plaintiffs. In the statement of decision accompanying the 2011 judgment, the trial court explained that, although defendants were liable for damages in Phases I and II, plaintiffs were not automatically prevailing parties because the damages were wholly offset by settlements.[38] The court then concluded that even if all the damage awards were offset to zero, it had discretion pursuant to *Goodman* to determine the prevailing parties. The court went on: "Plaintiffs are prevailing parties as a matter of law as to defendants Dow and Street because of the punitive damage award against them. As to defendants Modesto Steam, [Halford's], and PPG, plaintiffs did not attain equitable relief or retain a net monetary recovery. However, plaintiffs received settlements totaling $37.225 million from 16 defendants, favorable verdicts and decisions in Phases 1 and 2 that covered plaintiffs' exposure for past and future treatment costs, and Phase 2 Polanco Act attorneys' fees that are not subject to settlement credits. Thus, the Court finds plaintiffs are prevailing parties with respect to defendants Modesto Steam, [Halford's], and PPG because they have substantially achieved their litigation objectives."

The question we face is whether, as defendants contend, they were prevailing parties as a matter of law in Phases I and II, or whether the trial court had discretion to determine plaintiffs—including the RDA—were prevailing parties. The procedural posture of this case is unusual. Plaintiffs achieved success in Phase II in 2007, after prolonged litigation, only to have the trial court decline to order equitable relief nearly five years later, based on changes in circumstances that had occurred during the

---

[38] The court also explained that plaintiffs retained a net monetary recovery against Dow and Street because of the award of punitive damages. Because we have reversed the punitive damages award against Dow, we do not consider it as to Dow.

87

intervening years. The parties have drawn our attention to no case involving analogous facts, and our own research has disclosed none.

Defendants contend this case falls within two of the mandatory categories on Code of Civil Procedure section 1032: they argue they are both " 'a defendant where neither plaintiff nor defendant obtains any relief,' " and " 'a defendant as against those plaintiffs who do not recover any relief against that defendant.' " Therefore, they argue, the trial court did not have discretion to treat the RDA as a prevailing party.

We disagree and we are guided by *Goodman*. The plaintiffs there sued several defendants and settled with all but two of them, for a total of $230,000. (*Goodman*, *supra*, 47 Cal.4th at p. 1331.) At trial, plaintiffs were awarded $146,000 against the remaining defendants. The trial court exercised its discretion to find the nonsettling defendants were the prevailing parties because they paid nothing under the judgment. (*Ibid.*) On review, our high court considered whether plaintiffs fell within the terms of Code of Civil Procedure section 1032, subdivision (a)(4)'s provision that the party with the "net monetary recovery" is the prevailing party entitled to costs as a matter of right. The court concluded that, "when a plaintiff's prior settlement is more than the award received at trial, the plaintiff ultimately recovers nothing. [Citation.] In other words, the net recovery is zero." (*Id*. at pp. 1334-1335, fn. omitted.) The court explained: "Our holding today is simply that a plaintiff whose damage award is offset to zero by a prior settlement does not *categorically* qualify as a prevailing party ('the party with a net monetary recovery') as a matter of law. Unless a party otherwise fits into one of the remaining three categories of prevailing party under section 1032(a)(4), a trial court will have the *discretion* to make the determination as to a prevailing party under the section." (*Id*. at p. 1338, fn. 4.) The court then analyzed whether the trial court had abused its discretion in finding the defendants were prevailing parties, and concluded its finding was within the bounds of its discretion. (*Id*. at pp. 1338-1339.)

Plaintiffs did not receive a net monetary recovery in Phase II, and—except as to punitive damages from Street—will not receive a net monetary recovery in Phase I either. They therefore do not fall within the mandatory provision of Code of Civil Procedure

88

section 1032, subdivision (a)(4) for parties who achieve a "net monetary recovery." Defendants argue that because plaintiffs failed to obtain a net monetary recovery or equitable relief, *defendants* fall within two other mandatory categories of that section—"a defendant where neither plaintiff nor defendant obtains any relief," and "a defendant as against those plaintiffs who do not recover any relief against that defendant." This argument stands the rule of *Goodman* on its head. The effect of this position would be that where a plaintiff obtains a damage award, but the award is offset by settlement credits, the *defendant*—who was found liable for the plaintiff's damages—would be the prevailing party *as a matter of law*. But that is not what *Goodman* teaches. Rather, the rule of *Goodman* is that in such a case, the trial court has discretion to determine the prevailing party.

The trial court properly did so here. As the court noted in the November 2011 judgment, plaintiffs had received favorable verdicts in Phases I and II that ensured their remediation costs would be covered, either through damages or through equitable relief. More litigation then ensued—relating to other sites—for almost five years after the conclusion of Phase II. During that time, due to continued remediation at the Phase II sites and other circumstances, by the time the Phase V proceedings went forward, the trial court had determined equitable relief was no longer necessary. But this fortuity does not entitle defendants to be treated as prevailing parties as a matter of law, and the trial court acted entirely within its discretion in concluding plaintiffs, including the RDA, achieved their litigation goals and prevailed in Phases I and II.[39]

### 4. Cross-Defendants' Appeal: Allocation of Costs to City as Cross-Defendant

In their capacity as cross-defendants, the City and the Sewer District (collectively, City) have cross-appealed solely on the ground that the trial court erred when—in the

---

[39] We recognize the trial court based its prevailing party determination against Dow and Street in Phase I on the award of punitive damages, which—as to Dow—we are reversing. However, the trial court's rationale for the prevailing party determination against the other defendants in Phase I manifestly applies to Dow as well.

amended judgment—it found Dow, Street, and PPG prevailing parties entitled to recover costs from the City in their capacity both as plaintiffs and as cross-defendants in Phases III and IV. The City points out that, although it lost on the *complaint* in those phases, it was found not liable on the *cross-complaints*: the trial court granted non-suit on the cross-complaints in Phase III, and the cross-complaint was dismissed as moot in Phase IV after the trial court found defendants were not responsible parties under the Polanco Act.[40]

The parties disagree on how the trial court should determine the prevailing parties in those circumstances: Defendants contend they are prevailing parties in those phases without limitation, and the City (in its capacity as cross-defendant) contends that while it is not the prevailing party on the complaint, it *is* the prevailing party on the cross-complaints.[41]

### a. Preliminary Matters

Preliminarily, we address three matters. First, we have already concluded the trial court lacked jurisdiction to enter the amended judgment. The operative judgment, dated November 15, 2011, did not assess costs against the City in its capacity as cross-defendant. Further, we have vacated the directed verdict in Phase III and the ruling in

---

[40] In the cross-complaints, defendants sought contribution and indemnity from the City based on the City's allegedly improper operation and maintenance of its sewer system. The City's insurers undertook the defense of the cross-complaints, and the City was represented by separate counsel with respect to the cross-complaints. As explained by a brief filed on behalf of the City as cross-defendant, "Cross-Defendant City has tendered its defense and indemnification for the cross-complaints against various liability insurers, some of whom are defending and some of whom are at interest/at risk for a judgment against Cross-Defendant City on the cross-complaints. Those interests and risks are not represented by counsel for the plaintiffs, but rather by separate counsel for Cross-Defendant City." In the cross-appeal, the City acknowledges its inconsistent interests in its two capacities: in its capacity as plaintiff, its interest was in recovering damages from defendants, but in its capacity as cross-defendant, its interest was in minimizing the damages that could be apportioned to it.

[41] Curiously, the City does not seek its *own* costs incurred in defense of the cross-complaints, but merely asks us to amend the cost orders to provide that "Cross-Defendant City of Modesto" not pay any of defendants' costs.

90

Phase IV, and so the related cost awards must also be vacated. However, we shall address the issue the City raises to guide the trial court on remand.

Second, defendants contend the City was entitled to file only one notice of appeal (rather than two—one in its capacity as plaintiff, and one in its capacity as cross-defendant) and only one appellant's opening brief (rather than one in each capacity). (Cal. Rules of Court, rule 8.200(a)(1).) On this basis, they ask us to dismiss the City's second notice of appeal and disregard the opening brief filed on behalf of the City as cross-defendant. We decline this invitation. Whether or not the City was authorized to file a second notice of appeal, there is no doubt it is now before us on appeal from the judgment. And even assuming the appellant's brief filed on the City's behalf in its capacity as cross-defendant was improper, we decline to strike it. (See *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 728 [declining to strike improperly filed brief].)

Third, defendants contend the City's challenge to the allocation of costs in its capacity as cross-defendant is non-justiciable in this appeal, because it is, in essence, a dispute between the City and its insurers, who are not parties to this action, rather than between the City and defendants. In the interest of judicial economy, and because the trial court will have to address the allocation of costs on remand, we will address this issue now.

b. The Merits

As we have discussed, Code of Civil Procedure section 1032 sets forth four categories of prevailing parties who are entitled to recover costs as a matter of right. Among them is "a defendant where neither plaintiff nor defendant obtains any relief." (Code Civ. Proc., § 1032, subd. (a)(4).) Also of note, "unless the context clearly requires otherwise," the term " 'defendant' includes a cross-defendant." (*Id.* subd. (a)(2).) The question before us is whether this definition applies where, as here, a party obtains no relief on a complaint as plaintiff, but the defendant obtains no relief against the same party on a cross-complaint.

91

This question arose in *McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450 (*McLarand*). The plaintiff there, an architectural design firm, brought a breach of contract action against the defendant. The defendant, in turn, filed a cross-complaint against the plaintiff seeking damages. Neither party was awarded relief at trial, and each party sought costs. (*Id*. at pp. 1452-1453.) The plaintiff took the position that "when a defendant files a cross-complaint against a plaintiff, and neither party prevails on its action, both parties are 'prevailing parties' under section 1032 and both are entitled to an award of costs." (*Id*. at p. 1453.) The court disagreed. It reasoned, "The phrase 'a defendant where neither the plaintiff nor the defendant obtains any relief' cannot be interpreted as [plaintiff] urges. A defendant cannot obtain relief unless it files a cross-complaint against the plaintiff because affirmative relief cannot be claimed in the answer. [Citation.] The statute, therefore, already contemplates that when neither the plaintiff nor the defendant who has filed a cross-complaint prevails, the defendant is the prevailing party entitled to costs." (*Id*. at p. 1454.) The court also noted that its decision was consistent with two earlier cases, *Schrader v. Neville* (1949) 34 Cal.2d 112 (*Schrader*) and *Gerstein v. Smirl* (1945) 70 Cal.App.2d 238 (*Gerstein*), and held "[t]he phrase 'a defendant where neither plaintiff nor defendant obtains any relief' compels the conclusion that a defendant in this context does not include the plaintiff as a cross-defendant." (*McLarand*, 231 Cal.App.3d at p. 1455, fn. omitted.) (Accord, *Cussler v. Crusader Entertainment, LLC* (2012) 212 Cal.App.4th 356, 370-371; *Building Maintenance Service Co. v. AIL Systems, Inc.* (1997) 55 Cal.App.4th 1014, 1025-1027.) *McLarand* is on point, and it is controlling.

The City attempts to distinguish *McLarand* on the ground that the defendant there was compelled to file a cross-complaint or lose its right to assert its claim against the plaintiff, but that in our case, defendants would have been free to assert their claim for contribution and indemnity in a separate action. We are not persuaded. *Schrader* and *Gerstein*, upon which the *McLarand* court relied, both considered personal injury actions in which both the plaintiffs and the defendants were injured, and neither plaintiffs nor defendants obtained any relief against the other. (*Schrader*, *supra*, 34 Cal.2d at p. 113;

92

*Gerstein*, *supra*, 70 Cal.App.2d at p. 239.)  In deciding the defendants were the prevailing parties, the two courts reasoned in part that, had the plaintiffs not commenced the litigation by filing their complaint, the defendants might never have filed suit; but that once the action was filed, the defendants were compelled to assert their claims in the same action.  (*Schrader*, *supra*, 34 Cal.2d at p. 115; *Gerstein*, *supra*, 70 Cal.App.2d at p. 240.)  Rather than militating against the application of the same rule here, that reasoning is perhaps even more compelling on the facts of this case:  If the City had not brought its action against defendants seeking damages and equitable relief for the harm caused by defendants' products, defendants would have had no cause to bring their claims against the City, seeking contribution and indemnity based on their potential liability *to the City for that very injury*.  In any event, the compulsory nature of the cross-complaint was not the basis of the court's reasoning in *McLarand*; rather, the court concluded that the statutory language compelled the conclusion that the defendant was entitled to costs where neither the plaintiff nor the cross-complaining defendant prevailed.  (*McLarand*, *supra*, 231 Cal.App.3d at p. 1450.)

Contrary to the City's contention, the case of *Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117 (*Hearn Pacific*) does not dictate a different result.  There, the cross-complainant, Hearn, assigned to its insurer all of Hearn's "rights and interests" under its contract with the cross-defendant.  (*Id.* at p. 125.)  The insurance company then pursued the contract action against the cross-defendant and expressly alleged in an amended cross-complaint that it was doing so " 'in the name of . . . HEARN' " but *on its own behalf.*  (*Id.* at p. 126.)  The cross-defendant prevailed and, pursuant to the provisions of the contract, secured an award for prevailing party costs and fees.  It then moved the court to add the insurance company as a judgment debtor.  (*Id.* at pp. 126-127.)  The trial court denied the motion (*id.* at p. 128), and the appellate court reversed.  It concluded that, although Code of Civil Procedure section 368.5 allows a transferee party to continue the litigation in the name of the transferor, the transferee is nonetheless the real party in interest, and the device of

93

continuing the litigation in the name of the transferor does not operate as a shield to protect the real party from liability for adverse outcomes. (*Id.* at p. 134.)

*Hearn Pacific* has nothing to do with Code of Civil Procedure section 1032 or the determination of who is a prevailing party under the circumstances of this case. The City nevertheless argued that *Hearn Pacific* was applicable here for two reasons. First, the City asserted, *Hearn Pacific* teaches that "in determining the obligation for costs" the court should consider "the interest of an insurer that has been transferred rights from its insured who is a party to the litigation." So, here, City argued, the cross-defendants were defended by the insurer, and, under the principles of equitable subrogation they have "an interest to protect" with respect to costs. Second, the City argued, *Hearn Pacific* states the principle that, in awarding costs, the court should consider "fairness" and "equitable considerations" and, although in *Hearn Pacific* those equitable factors weighed against the insurer, here they do not. The City's reliance on *Hearn Pacific* for these principles is too much of a stretch. The court there concluded that the insurance company cannot accept the benefits of the assignment without also being subject to its burdens (*Hearn Pacific*, *supra*, 247 Cal.App.4th at p. 134); the court did not rely on equitable considerations or fairness in determining that, as a legal matter, the insurance company should be added as a judgment debtor, it being the real party in interest. Nothing in *Hearn Pacific* suggests that an insurer's interest in its costs of suit should be considered separately in determining who is the prevailing party, even when the insurer is the real party in interest, much less here, where the City is the real party.

## V. DISPOSITION

The order denying reconsideration of the summary adjudication of the nuisance claims is vacated and the matter is remanded with directions to deny the motions for summary adjudication on the nuisance claims and to conduct further proceedings.

The punitive damages award against Dow in the Phase I proceeding is reversed.

The order granting the Motion for Directed Verdict Re Property Damage in the Phase III proceeding is vacated, except as to any of those sites for which nonsuit was granted on other grounds, and the matter is remanded for further proceedings

94

The decision and order denying relief in the Phase IV proceeding is reversed and the matter is remanded for further proceedings.

The amended judgment is vacated as void.

The prevailing party determinations with respect to Phases III and IV are vacated as a result of our decision to vacate the Phase III directed verdict and the Phase IV decision and order.

The order allocating settlement credits is vacated.

In all other respects we affirm the judgment entered on November 15, 2011.

All parties shall bear their own costs on appeal except for those costs comprised of attorney's fees to which a party may be entitled pursuant to statute, which shall be determined in the first instance in the trial court.

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Streeter, J.

City of Modesto et al. v. The Dow Chemical Company et al. (A134419)

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Honorable Ernest H. Goldsmith |
| Counsel for Plaintiffs and Appellants, City of Modesto et al.: | Miller, Axline & Sawyer, Duane C. Miller and Michael D. Axline; Bien & Summers, Elliot L. Bien and Jocelyn S. Sperling; Susan Alcala Wood and Adam U. Lindgren, City Attorneys of Modesto; Roland R. Stevens, Special Counsel. |
| Counsel for Plaintiff and Appellant, City of Modesto Redevelopment Agency: | Brown & Winters, William Douglas Brown. |
| Counsel for Plaintiff and Appellant, City of Modesto Sewer District No. 1: | Davidovitz & Bennett and Cooper & Scully, Moris Davidovitz; Davidovitz & Bennett, Charles H. Bolcom and Coreal Riday-White. |
| Counsel for Defendant and Respondent, The Dow Chemical Company: | King & Spalding, Gennaro A. Filice III and Paul R. Johnson. |
| Counsel for Defendant and Respondent, Axiall Corporation, successor in interest to PPG Industries, Inc.: | Beveridge & Diamond, Gary J. Smith and Mark A. Turco; Beveridge & Diamond and Katten Muchin Rosenman, Lily N. Chinn. |
| Counsel for Defendant and Respondent, R.R. Street & Co.: | Hicks Thomas, Eric A. Grant and John B. Thomas. |
| Counsel for Defendant and Respondent, Halford's Cleaners: | Schuering Zimmerman & Doyle, Keith D. Chidlaw and Andrew S. Larsen. |
| Counsel for Defendant and Respondent, Modesto Steam Laundry & Cleaners: | Bassi Edlin Huie & Blum, William Noel Edlin and Antonio P. Garcia, Jr. |